(No. 11924.—Judgment affirmed.)

The Matthiessen & Hegeler Zinc Company, Plaintiff in Error, *vs.* The Industrial Board of Illinois *et al.* Defendants in Error.

*Opinion filed June 20, 1918—Rehearing denied October 2, 1918.*

1. Workmen's compensation—*word "accident" is not a technical legal term.* The word "accident" is not a technical legal term with a clearly defined meaning, but anything that happens without design is commonly called an accident.

2. Same—*Workmen's Compensation act is intended to cover all liabilities of employers for injuries to employees.* The Workmen's Compensation act is intended as a substitute for previous rights of action of an employee against his employer and to cover the whole ground of the liability of the master for injuries sustained by an employee which have resulted from a failure of duty on the part of the employer.

3. Same—*meaning of word "accident" in Workmen's Compensation act.* The words "accident" and "accidental injury," as used in the Workmen's Compensation act, were meant to include every injury suffered in the course of employment for which there was an existing right of action at the time the act was passed and to extend the liability of the employer to make compensation for injuries for which he was not previously liable; and an injury is accidental, within the meaning of the act, which occurs in the course of employment unexpectedly and without the affirmative act or design of the employee.

4. Same—*when death of an employee is from accident rather than from occupational disease.* Where a fireman for a zinc smelting plant, whose duties were to draw the scum from the molten zinc, which contained arsenic and gave off fumes or gases, becomes sick and dies after a few days' illness with symptoms of arsenical poisoning, the administrator may recover compensation under the Workmen's Compensation act as for accidental injury, where the defense that the death was the result of an occupational disease is not established by the evidence, which shows that during the fifty years' active operation of the plant no case of lead or arsenical poisoning had ever been known.

Writ of Error to the Circuit Court of LaSalle county; the Hon. S. C. Stough, Judge, presiding.

CLARENCE GRIGGS, and WILKERSON, CASSELS & POTTER, (RALPH F. POTTER, of counsel,) for plaintiff in error.

BROWNE & WILEY, for defendants in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The administrator of Joseph Adrian claimed compensation for his death on October 14, 1914, alleged to have resulted from an accidental injury in the course of his employment by the plaintiff in error in its business of smelting zinc ores at Peru. The arbitrator awarded compensation and on a review by the Industrial Board the award was confirmed. The record was certified to the circuit court of LaSalle county in return to a writ of *certiorari* and the award was again confirmed. The court certified that the case was one proper to be reviewed by this court.

The decision will depend upon the conclusion to be drawn from the following undisputed facts: Joseph Adrian prior to October 6, 1914, had worked continuously for the plaintiff in error in its plant for thirty-eight years and during the last fifteen years had been a fireman at the furnaces in the smelter. Each day he was required twice during his eight-hour period to work for about forty-five minutes in drawing the scum and dross, or oxide as it is called, from the surface of the molten zinc or spelter. For this purpose he used an iron rod about fifteen feet long with a scraper on the end. He threw sal ammoniac on top of the molten spelter, and, inserting the rod in the furnace, drew the scraper over the top of the molten metal, drawing from the surface the scum or dross, which fell on a platform in front of the furnace, giving off hot, burning gases, vapors and fumes until it cooled. There was a hood over the furnace, but it did not extend over the place where the oxide fell and did not take away the gases generated by it. In that work he was part of the time within four or five feet of

the furnace door, and when the oxide was cold he shoveled it up and it was taken away. The ore smelted by plaintiff in error contained 99 per cent of zinc, a fraction less than two-tenths of one per cent of lead and a trace of arsenic. The plaintiff in error had operated the plant for nearly fifty years, and no case of lead, zinc or arsenical poisoning had ever appeared there. Adrian during all his years of service had been in good health with the exception of two accidents. About eight years before his death he was scalded by flying molten metal, but the burns soon healed over and left only scars, and about a year before his death he fell and cut the bridge of his nose but worked all the time, and it also healed leaving a scar. He had never been affected with any appearance of disease or disability by lead, zinc or arsenical poisoning, and in the year before his fatal illness he never missed a day except when there was no work. Two other men who worked with Adrian doing precisely the same work for more than ten years had never been injuriously affected in any way by their work. October 6, 1914, came on Tuesday, and Adrian was in his usual health up to the morning of that day. The plant was operated generally only five days in the week, and he worked on the previous Saturday until ten o'clock at night but did not work on Sunday or Monday. On Tuesday morning he began work at six o'clock, and on leaving home for the plant said that he did not feel like going to work. He worked until two o'clock in the afternoon, when he went home sick and had dysentery. His daughter had been slightly affected in the same way during the day and she at first attributed his sickness to coffee which he had drunk, which was discolored when milk was poured in it, but the attending physician found that there was nothing the matter with the coffee, and other members of the family who had drunk the coffee were not affected. About eight o'clock in the evening Adrian was seized with cramps through his arms and legs, chest, stomach and bowels, and from that

time he grew steadily worse. His discharges were black and loose. His teeth became black and loose, there was a dark line around his gums, his toe nails and finger nails became black, his eyes had a glassy, staring look, his wrists dropped and his mind wandered. He was treated at home until October 12 when he was taken to a hospital, where he died on October 14.

The petition filed with the Industrial Board based the claim for compensation upon the ground that Adrian absorbed such a quantity of lead that he was poisoned and his death ensued. Two doctors gave opinions as to the cause of death. One of them testified that the symptoms indicated lead and arsenical poisoning; that lead poisoning was commonly the result of a long course of absorption, and his conclusion was that the death was from arsenical poisoning alone. The other doctor gave an opinion that the death was due to arsenical poisoning, and said that usually such poisoning was not acute but that arsenic is a cumulative poison, which accumulates in the system until it gets to a point where the poison springs into life and there is an explosion which is of an acute nature. He thought that probably Adrian's system became surcharged with arsenic which finally became acute arsenical poisoning, causing his death. The finding of the board was that the death was due to acute arsenical poisoning not of a chronic nature, or a culmination of a gradual development of a long course of poisoning.

The objections of the plaintiff in error to the judgment are two: First, that the Workmen's Compensation act only provides compensation for accidental injuries and there was no evidence that any accident happened to Adrian; second, that Adrian's death was caused by an occupational disease, which is not accidental within the meaning of the act.

The title of the Workmen's Compensation act, which by the constitution must express the subject of the act, shows the subject to be the promotion of general welfare by pro-

viding compensation for accidental injuries or death suffered in the course of employment. Section 1 provides that any employer may elect to provide and pay compensation for accidental injuries sustained by any employee arising out of and in the course of the employment, according to the provisions of the act. Section 24 provides for notice to the employer not less than thirty days after the accident, and section 30 makes it the duty of every employer to make a report to the Industrial Board of all accidental injuries, so that by the title and provisions of the act compensation is only to be awarded for an injury or death which is accidental or the result of an accident within the meaning of those words as used in the act. The word "accident" is not a technical legal term with a clearly defined meaning, and no legal definition has ever been given which has been found both exact and comprehensive as applied to all circumstances. Different definitions are given, with a very full citation of cases, in 1 Corpus Juris, 390. Anything that happens without design is commonly called an accident, and at least in the popular acceptation of the word any event which is unforeseen and not expected by the person to whom it happens is included in the term. Different meanings are given to the word where it is made the ground for equity jurisdiction and where it occurs in accident insurance, and as applied to injuries to a servant without negligence of the master and for which he has not been held liable. The meaning of the word as used in the Workmen's Compensation act is necessarily influenced by the various provisions of the act and the purpose of its enactment, and cannot be determined, alone, from any definition found in a dictionary. The act was designed as a substitute for previous rights of action of employees against employers and to cover the whole ground of the liabilities of the master, and it has been so regarded by all courts. Section 1 of the act provides that the employer may elect to provide and pay the compensation therein provided for and thereby

relieve himself from any liability for the recovery of damages by an employee except as provided in the act, which clearly manifests the legislative intention to provide limited compensation for every injury for which there had been a right of action by an employee against his employer resulting from any failure of duty on the part of the employer. Having established a fixed compensation against employers under the act, section 3 places those employers under the act and those rejecting it on the same level as to defenses, by providing that in any action to recover damages against an employer who has rejected the act he shall not be entitled to the defense of assumed risk, or that the accident was caused by the negligence of a fellow-servant, or that it was approximately caused by the contributory negligence of the employee. It is therefore clear that the words "accident" and "accidental injury," used in the act, were meant to include every injury suffered in the course of employment for which there was an existing right of action at the time the act was passed; also to extend the liability of the employer to make compensation for injuries for which he was not previously liable and to limit such compensation. The act, in taking away existing rights of action of the employee and extending the liabilities of the employer, fixes limits to the amount to be recovered, and is sustained as a legitimate exercise of the police power for the promotion of the general welfare by covering the entire subject with fixed rules. (*New York Central Railroad Co.* v. *White*, 243 U. S. 188.) The words "accident" and "accidental injury" imply, and the provisions for notice to the employer within thirty days after an accident and his report to the Industrial Board of accidental injuries show, that an injury, to be accidental or the result of an accident, must be traceable to a definite time, place and cause, but if there is such a definite time, place and cause and the injury occurs in the course of the employment the injury is accidental within the meaning of the act and the obligation to provide and pay com-

pensation arises. While it is not intended, and perhaps not possible, to give a definition of the words used in the act as applied to all possible circumstances, it may safely be said that an injury is accidental, within the meaning of the act, which occurs in the course of the employment unexpectedly and without the affirmative act or design of the employee. In this case there was evidence from which the Industrial Board was warranted in finding that on October 6, 1914, in the course of the employment of Adrian he contracted arsenical poisoning which resulted in his death. It is true that Adrian had been exposed to practically the same conditions for many years without injury, but it would not be unreasonable to conclude that his immunity was because of the state of his health and his ability to resist the deleterious effect of the gases and fumes over which he worked, but this time his physical condition was such as to make him susceptible to arsenical poisoning in such a degree as to bring on his fatal illness and death. There was sufficient competent evidence before the board to sustain the finding and it cannot be disturbed.

The second objection to the judgment is that Adrian died from an occupational disease incident to the business of smelting zinc. A disability caused in that way or from that source is not to be regarded as an accident, because such a disease has its inception in the occupation and develops over a long period of time from the nature of the occupation and not from any unusual or unforeseen cause or event. For the prevention of such diseases there is a statute requiring the employer to use certain precautions for the safety of the employee, and an action may be maintained against the employer for failure to comply with the provisions of the act. (*Wilcox* v. *International Harvester Co.* 278 Ill. 465.) For such failure the injured employee is not confined to the compensation provided by the Workmen's Compensation act nor limited by the amount provided by the act. For nearly fifty years in the active oper-

ation of the plant of the plaintiff in error a case of lead or arsenical poisoning had never been known, and the plaintiff in error would have had a perfect defense to the death of Adrian on the ground of the failure to obey the statute relating to occupational diseases. There was no evidence tending in any degree to prove that the arsenical poisoning of Adrian was a disease incident to the occupation of the plaintiff in error.

The judgment is affirmed.        *Judgment affirmed.*