INDUSTRIAL COMMISSION OF OHIO *v.* TOLSON ET AL.,
INFANTS.

(Decided May 7, 1930.)

*Mr. Gilbert Bettman,* attorney general, and *Mr. R. R. Zurmehly,* for plaintiff in error.

*Mr. Charles Boyd* and *Mr. Samuel W. Crawford,* for defendants in error.

FARR, J. The Industrial Commission of Ohio v. Frank Tolson and Laberta Tolson, Infants, by Henry Williams, Their Next Friend, and Anna Tolson, is an error proceeding prosecuted in the Court of Appeals of Carroll county to reverse a judgment of the court of common pleas of that county, and by consent of parties the cause was heard in Harrison-county.

The action below was an appeal from the refusal of the Industrial Commission of Ohio to allow compensation for the death of John Tolson, who, it is claimed, inhaled monoxide gas in what is known as the Sterling Coal Mine near the village of Salineville, the mine being located in Carroll county and operated by the John M. Hurst Company.

The cause came on to be heard on the issues joined in the court below, and resulted in a verdict awarding compensation to the claimants below; that is, the right to recover under the Workmen's Compensation Law of Ohio. From the judgment so entered, error is prosecuted in this court upon the grounds alleged in the petition in error, and especially upon the grounds that there is no testimony to support the verdict of the jury and the judgment, and that the judgment is contrary to law.

The facts of importance are as follows:

John Tolson was a miner by occupation, living in the village of Salineville. For a number of years he had been employed in what is known as the Sterling Mine, situated near that village. On the 28th day of September, 1926, he went into the mine as usual, and was working in a room at the left of what is known as entry No. 3. Later in the day he fired a shot or shots, which in the common parlance

of mining affairs is known as the process by which coal is loosened, after which it is loaded into pit wagons and hauled to the front. One of the duties of Tolson was to fire these shots and then load the coal into the pit wagons so that it might be hauled from the mine. After firing a shot or shots, Tolson became ill, went from the mine to Dr. McCullough's office in the village of Salineville, and from there to his home, and never returned to the mine, and early in the morning of the 7th day of October following he died. And it is claimed that he died from the effects of what is known as carbon monoxide gas that he inhaled in the mine on the morning of September 28th, which resulted in his death a few days later.

It is insisted on behalf of the Industrial Commission that his death is not compensable under the Workmen's Compensation Law of Ohio.

Section 1465-68a, General Code, entitled "Compensation of Disabled Employee or Dependents," enumerates the different "occupational diseases" for which recovery may be had, and paragraph 14 of the schedule provides for carbon dioxide, while other paragraphs provide what other occupational diseases are compensable. It is sufficient to say that carbon monoxide gas is not mentioned in the section.

Section 1465-68 provides that every employee mentioned in Section 1465-61, who is injured in the course of employment, or the dependents of such as are killed in the course of employment, etc., are entitled to recover compensation for such injury or death. It is sufficient in this connection to say that John Tolson in all probability would not come within the purview of Section 1465-68a, and that, if his

dependents are entitled to recover in this action, it is under favor of Section 1465-68, which provides for compensation to the dependents of a person killed. And the issue here narrows down to the question whether or not that which happened to John Tolson in the Sterling Mine on September 28, 1926, was an accidental injury and compensable in favor of his dependents.

The jury evidently found upon the trial in the court below, from the evidence adduced, that John Tolson died as the result of an injury. The record in this behalf discloses that Tolson was a man of fifty odd years of age, vigorous and strong, and that he had worked in coal mines for a number of years—this from the testimony of Dr. McCullough who attended him during his last illness. Ray Lewellyn, who worked near him, Charles Wheatley, who worked near by, Ed. K. Brown, and other witnesses, testified that Tolson was a man vigorous and in good health, apparently so at least, prior to September 28, 1926.

It is alleged in the petition, however, that "on September 28th, 1926, and for a long time prior thereto, John Tolson, now deceased, while in the performance of his duties under his said contract of hire with the said John M. Hurst Company at the said company's mine in Carroll county, Ohio, sustained injuries and was injured in said mine on said day, and for a long period of time prior to said day, in this, said mine at the place where John Tolson was assigned to work by said John M. Hurst Company, and where he did work filled with and contained a deadly poisonous gas, being carbon dioxide or other deadly poisonous gas, the name of which

plaintiffs do not know, and said John Tolson was obligated to and did inhale and breathe said gas, at said place in said mine, where he was assigned by said John M. Hurst Company, and by reason thereof, his body was injured, and his heart and lungs and blood became infected and thus and thereby his death was caused on the 7th day of October, 1926.''

It is urged in argument that it is alleged in the petition, as above set out, that for a long period prior to September 28, 1926, he sustained this injury, and that therefore it was a disease; but it may also be noted from the above quotation that the petition is specific and alleges among other things that ''on September 28th, 1926, while in the performance of his duties, he sustained injuries and was injured in said mine on said day.''

There is therefore quite sufficient in the petition, together with the above allegations, to make testimony of an injury on September 28, 1926, competent, and it is further alleged in the petition that as a result of that injury the blood was injured and the heart affected, from the effects of which he died. Therefore, the allegation of continuing injury or injuries is not important.

And what is the testimony in his behalf? The record discloses that prior to this time Tolson had been in good health; that he was rather rugged, one witness says; worked every day when there was work to be done; he went into the mine on this morning and entered upon the work of the day. It is conceded that a shot or shots were fired; that he was to load coal; that he became sick within the mine; and that he went out and went to the office of Dr.

McCullough. Dr. McCullough had known him practically all his life, and is one of the witnesses who says he was strong and well so far as he was able to discover; that he found him that morning suffering from monoxide poisoning; that he had every appearance of it; and that he attended him until his death. He was with him at the time of his death, and says that at that time his face, flushed in color, was reddened; and the undertaker, Hudson, who cared for the body, and who drew the blood from it, says that it had thinned, and that it bore every trace of having turned a lighter red in color, and Hudson is corroborated by the testimony of Dr. McCullough, who says that the face bore a flushed expression.

Ray Lewellyn, who worked near Tolson, says that the mine had very poor ventilation. It will be recalled that this entry was about two or two and one-half miles long. The fan that drove the air into the mine was about a mile and a half distant from this room. And the mine superintendent, who had the mine in charge within a month prior to that time, says that it had one of the worst systems of ventilation known to coal mining. That reflects somewhat favorably upon the claim that Tolson suffered from monoxide gas poisoning. Lewellyn testified that the smoke from a blast fired would hang sometimes for an hour within the room in which the shot was fired, and that monoxide gas was thereby generated.

Probably the most persuasive testimony in that behalf is the testimony of Robert Wheatley, who had been a mine superintendent for some years, and then became a student of mine gases for a period of eighteen years. He says that, where black powder is used for shooting coal within a mine, it generates monox-

ide gas; that almost invariably monoxide results from the use of black blasting powder. He makes a detailed statement of the chemicals used in the manufacture of black powder, and says that sometimes the chemicals are not properly combined and the result is a larger amount of monoxide gas. Tolson had worked in this mine several years; he had never been sick before, only complained of headaches and bad air. Ray Lewellyn complains of the same after firing shots, and says that "they would be subjected to headaches."

But on this morning, Tolson, who, it is conceded, was industrious, left the mine and went out, too ill to work, or ever to return to the mine. Therefore the question arises, Was there a sufficient amount of gas upon this particular morning to produce the result which followed? The jury would have a right to so conclude in the light of the testimony, especially that of Robert Wheatley, who, as above stated, has made a study of mine gases.

Therefore there was quite sufficient testimony for the jury to determine in the instant case that Tolson's condition on this morning was the result of the shots fired, and the generation of monoxide gas thereby. It might be said, however, that there is no *direct* testimony that gas generated upon this particular morning — only the circumstances which rather clearly indicate it—save and except the testimony of Lewellyn, Heatherington, and Wheatley, the latter a student of mine gases, that gas was generated upon this morning. But the matter does not rest there. Dr. McCullough, who saw Tolson a short time after he left the mine, pronounced his condition due to monoxide gas poisoning, and described the ap-

pearance—a flushed face—and the other conditions that follow monoxide poisoning. In fact, every indication, so far as the record goes, from the time Tolson left the mine until his death, points to monoxide poisoning.

The question might also arise as to why, if that were true, Tolson did not die immediately. The testimony of Wheatley goes further to show, and he names persons subjected to tests made, that a very small amount, perhaps a fraction of one per cent. of monoxide gas, would produce sickness, vomiting, nausea, and sometimes, but not always immediately, severe illness and death.

In all discussions it is referred to as a deadly poisonous gas. Therefore there is quite enough testimony to support the view that Tolson must have gotten a sufficient amount on this morning to produce the very result that followed. And the testimony is also sufficient to sustain the conclusion of the jury that Tolson was a victim of monoxide gas. It was not, of course, an occupational disease. *Industrial Commission* v. *Roth,* 98 Ohio St., 34, 120 N. E., 172, 6 A. L. R., 1463, as provided for in the Constitution of Ohio, Article II, Section 35, and Section 1465-68*a,* General Code. Was it, therefore, an ''accidental injury'' within the meaning of the statute?

First: Was it accidental? About this there can be but little question, having in mind the definition of the word. In 1 Corpus Juris, 396, ''accidental'' is defined as follows: ''Happening by chance or unexpectedly; taking place not according to the usual course of things; casual; fortuitous.'' See, also, the notes appended.

In Words and Phrases, Third Series, Volume 1,

pages 68, 69, 70, 71, and 72, the words "accident" and "accidental" are well defined, and especially so at page 72 where it is said in part: "An accidental injury, within the Compensation Act, is one occurring in course of employment unexpectedly and without affirmative act or design of employee, but the word 'accident' is not to be technically construed." *Jefferson Printing Co.* v. *Industrial Commission,* 312 Ill., 575, 144 N. E., 356, 358.

In *Gurski* v. *Susquehanna Coal Co.,* 262 Pa., 1, 104 A., 801, it is held that, where a miner going to get tools in a part of the mine where he was told not to go, died from noxious gases, he died as the result of an accident occurring "in the course of his employment" within Workmen's Compensation Act. See, also, *Van Vleet* v. *Public Service Co. of New York,* 111 Neb., 51, 195 N. W., 467.

Other cases announcing the same principle are: *Furst Kerber Cut Stone Co.* v. *Mayo,* 82 Ind. App., 363, 144 N. E., 857; *Winona Oil Co.* v. *Smithson,* 87 Okl., 226, 209 P., 398; *Crews, Gdn.,* v. *Moseley Bros.,* 148 Va., 125, 138 S. E., 494; *Savage* v. *City of Pontiac,* 214 Mich., 626, 183 N. W., 798; *Bryant, Admx.,* v. *Fissell,* 84 N. J. Law, 72, 86 A., 458; *John H. Kaiser Lumber Co.* v. *Industrial Commission,* 181 Wis., 513, 195 N. W., 329; *Steel Sales Corp.* v. *Industrial Commission,* 293 Ill., 435, 127 N. E., 698, 14 A. L. R., 274; *Haskell & Barker Car Co.* v. *Brown,* 67 Ind. App., 178, 117 N. E., 555; *McNeil* v. *Panhandle Lumber Co.,* 34 Idaho, 773, 203 P., 1068; *Matthiessen & Hegeler Zinc Co.* v. *Industrial Board,* 284 Ill., 378, 120 N. E., 249; *Prouse* v. *Industrial Commission,* 69 Colo., 382, 194 P., 625.

Reflecting somewhat upon this issue is *Industrial Commission* v. *Roth,* 98 Ohio St., 34, 40, 120 N. E., 172, 174, 6 A. L. R., 1463, where Donahue, J., defines "accident" as follows: "An 'accident' is some happening that occurs by chance, unexpectedly, and not in the usual course of events."

However, some important propositions are deducible from the foregoing cases, among which are that "accident" or "accidental" does not have a settled legal signification, but a generally accepted meaning, which is not technical in character; as used in a popular sense, it is any unlooked-for mishap or untoward event not expected or designated, which well applies in the instant case, for Tolson surely did not expect or design the accident which led to his death. It was therefore an "accident," and the next inquiry is, Was it an "injury?"

It may be agreed at the inception that, if an injury, it was not traumatic; therefore was it an injury of another character? The jury, as a question of fact, evidently reached the conclusion that Tolson's condition was due to carbon monoxide gas, and, as before stated, there is sufficient testimony to sustain such finding. What, then, is the nature of monoxide gas and its effect on the human body?

In Morse and Colcord on "Emergencies of a General Practice," the subject of a monoxide gas is discussed at some length at pages 87-96. CO is the chemical symbol of carbon monoxide. Paragraphs of interest are as follows:

"Carbon monoxide poisoning, as usually encountered, is an acute condition resulting from breathing atmospheres containing that gas. It is characterized clinically by headache, dizziness, weakness in the

legs, increased respiration at first, which later becomes irregular and depressed, collapse, unconsciousness and death; anatomically it is characterized by temporary changes in the red blood cells, due to the combination of carbon monoxide with hemoglobin, and, in prolonged severe exposures, degenerative changes in various tissues of the body, especially those of the central nervous system.''

''The presence of that poisonous gas, carbon monoxide (white damp), in the after-damp of explosions and fires in mines, has caused the death of a great many miners. An inspection of the reports of those explosions and mine fires in which men have been killed shows that this gas is often the cause of the majority of the fatalities. Haldane makes the statement that carbon monoxide poisoning is responsible for nearly all the fatalities. After a recent disaster at a mine in Pennsylvania, in which twenty-one men were killed, the bodies of seventeen showed no such marks of violence as would be produced by the concussion of an explosion. Tests of blood from some of these bodies clearly showed the bright pink hue caused by carbon monoxide. Examination of the blood of victims of other explosions has shown that carbon monoxide was largely responsible for the fatalities. Not only have men present in mines at the time of disasters succumbed to this gas, but rescuers endeavoring to save their unfortunate comrades have perished also; of the gases produced in mines carbon monoxide is the most feared and the most difficult to detect. A miner's lamp gives warning of almost every dangerous condition of the atmosphere in a mine except the presence of this gas. Carbon monoxide may be present in deadly quantities in

an atmosphere without the safety lamp detecting it, because a proportion much below that required to affect a cap lamp flame is extremely poisonous. Carbon monoxide is a colorless gas, having no odor or taste except in high concentrations; having about the same weight as the air, it diffuses readily.''

An interesting discussion of monoxide gas is to be found in Government Bulletin No. 39. At pages 26 and 27, it is said:

''Carbon Monoxide, known to most coal miners as white damp, is sometimes called carbonic oxide gas, in the older text books. Its chemical formula is CO, which indicates that it is composed of one atom of carbon united with one atom of oxygen. Carbon monoxide is always formed as the product of Incomplete Combustion. It is produced by mine fires and explosions, and also by the explosions of black blasting powder, permissibles and dynamite. In all of these cases the reason for the production of CO is the same, there was not sufficient oxygen present to completely burn the carbon present in the menthane coal dust, or explosives. Practically the only poisonous gas with which a coal miner is concerned is carbon monoxide. Even minute percentages will produce harmful effects if breathed for a few hours. To fully understand the action of CO on the body we must remember that the red coloring matter of the blood (hemoglobin) acts as a carrier of oxygen to all parts of our body. It carries the oxygen loosely, so that when it reaches the place where the oxygen is needed it just drops it there. The hemoglobin acts quite differently with CO. It has an affinity for CO 250 times greater than its affinity for oxygen, so that when it picks up some CO it

hangs on to it and will not let go. In a short time if CO is breathed the coloring matter has loaded up with so much CO that it cannot get enough oxygen to supply the body, and the person is overcome from lack of oxygen. This explains why a person breathing only small percentages will be overcome in time. Dr. Haldane states that a man at rest and breathing air containing .1 per cent. CO would be unable to walk in about two and one-fourth hours, while if he was walking instead of resting his legs would give way in about an hour. Col. Burrell, of the Bureau of Mines, experimented on himself by breathing an atmosphere containing 0.25 per cent. CO for 20 minutes. At the end of that time he had a slight headache, but later became very ill for several hours. When breathed in larger quantities, a person may be overcome almost instantaneously. The CO acts without warning, and cases are on record where men have simply fallen in their tracks on walking into an atmosphere containing considerable CO from an explosion or fire. In air containing about 0.5 per cent. CO, unconsciousness would occur after a few breaths had been taken. On the other hand, Haldane states that exposure to an atmosphere containing more than 0.02 per cent. might cause headaches and disablement.

"Men overcome by CO generally have more color than usual on account of the blood being made a brighter red by the gas."

It will be recalled that Tolson was using black blasting powder, and that he was in the unmistakable condition produced by monoxide poisoning, and the best authorities agree that it affects the blood by the hemoglobin, which carries the CO instead of the

oxygen, thereby affecting the organs of the body and producing death. Can it then be successfully maintained that such an influence, such an effect upon the body, is *not* an injury? If it is not, then what is it? It injures the blood, the very current of life, by loading it with poison and practically destroying its capacity to carry life-giving and life-saving oxygen, thereby producing "headache, dizziness, weakness in the legs, increased respiration at first, which later becomes irregular and depressed, collapse, unconsciousness and death." It is said, in "Morse and Colcord" that it causes *"Degenerative changes in various tissues of the body and death,"* and yet it is claimed that it is not an "injury." It is difficult to believe that this odorless, invisible, deadly thing that causes death does not, by doing so, inflict an injury upon a human body, because it is no more a disease than when an intending suicide takes a deadly poison which attacks and degenerates certain tissues of the body, injuring the blood, depressing the heart action, increasing respiration, producing unconsciousness and death, which certainly has never been recognized as a disease. And while the word "injury" as used in the above statute, Section 1465-68, General Code, is used for a somewhat particular purpose, or in rather a special sense, as "bodily injury," yet Webster's definition may be properly applied as follows:

"1.  Damage or hurt done to or suffered by a person or thing; detriment to, or violation of, person, character, feelings, rights, property, or interests, or the value of a thing.    *    *    *

"3.  Law.  An actionable wrong; that is, any violation of another's rights for which the law allows

an action to recover damages or specific property or both.''

The trend of judicial thought thus far has been generally in harmony with the foregoing in defining and applying the word ''injury'' as related to casualties from mine gases.

In ''Bradbury's Workmen's Compensation'' (3d Ed.), at page 398, paragraph 77, under ''Inhalation of Noxious Gases,'' it is said:

''Involuntary inhalation of gas has been held to be an accidental injury within the meaning of a policy insuring an individual against accidental injury.'' *Paul* v. *Travelers' Ins. Co.,* 112 N. Y., 472, 20 N. E., 347, 3 L. R. A., 443, 8 Am. St. Rep., 758; *Pickett* v. *Pacific Mut. Life Ins. Co.,* 144 Pa., 79, 22 A., 871, 13 L. R. A., 661, 27 Am. St. Rep., 618; *Pollock* v. *United States Mut. Accident Assn.,* 102 Pa., 230, 48 Am. Rep., 204; *United States Mutl. Accident Assn.* v. *Newman,* 84 Va., 52, 3 S. E., 805; *Sinclair* v. *Maritime Passengers Ins. Co.,* 3 Ellis & Ellis, 476.

While it might be said that some of the foregoing are insurance cases, yet the same is true of the instant case, but only different in form, and the foregoing as well as the instant case involve ''accidental injury.''

And again, at page 414, paragraph 88, the author observes, under ''Mine Gas Poisoning,'' that:

''While it was assumed that mine gas poisoning would be an injury arising out of the employment, it was held in the present case that the evidence was insufficient to show such injury. *Burgess* v. *Empire Mines and Investment Co.,* 2 Cal. Ind. Acc. Com., 86.''

But in the case at bar the jury found, from the evidence, and properly so, that Tolson's trouble was monoxide gas. The point in the above, important here, is that mine gas poisoning would be an "injury" arising out of the employment. In 10 Negligence and Compensation Cases, Annotated, at page 257, are the cases of *In re McPhee* and *In re London Guarantee & Accident Co., Ltd.*, by the Supreme Judicial Court of Massachusetts, 222 Mass., 487, 109 N. E., 633, both of which are of interest, especially annotation B at page 261, where the case of *Giacobbia* v. *Kerens-Donnewald Coal Co.*, Ill. Ind. Bd. Dec., May 12, 1915, is discussed, the facts being very similar to those in the instant case, where the board evidently favored a recovery. At page 274, paragraph 7 of 10 Negligence and Compensation Cases, Annotated, under "Gas Fumes in Pumping Station," the case of *Bishop* v. *City of Chicago,* Ill. Ind. Board, is another case very similar to the one at bar as to facts; the board holding favorably to the claimant where a chemical analysis of the blood disclosed monoxide of carbon in the blood, which produced cerebral hemorrhage and death.

In 32 Corpus Juris, 521, Section 20, discussing "Injury," it is said under "Violence or Disease":

"In a limited meaning, when personal injuries are spoken of, there are apt to be meant only bodily injuries suffered through violence in some form or, to some extent, traumatic injuries. However, when the word 'injury' is used in the sense of 'bodily injury,' it may mean not only 'bodily injury' suffered by or resulting from violence, but it may cover any

harmful effect upon the body whether by violence or by disease."

While disease is *not* involved in the instant case, and the record does not prove a disease, yet it was a "harmful effect upon the body" that killed Tolson.

As sustaining the foregoing is cited the case of *City and County of San Francisco* v. *Industrial Accident Commission,* 183 Cal., 273, 191 P., 26, by the Supreme Court of California, wherein the word "injury" is exhaustively discussed. The action arose under the Industrial Accident Law of California, which is quite similar to the Workmen's Compensation Law of Ohio, inasmuch as it provides "for any injury sustained by an employee arising out of and in the course of the employment." The opinion is by Olney, J., who observes at page 275 of 183 Cal., 191 P., 26:

"The word 'injury' as so used means, of course, only bodily injury, and the position of the city is that it means only bodily injury suffered by or resulting from violence, while the position of the commission is that it covers any harmful effect upon the body, whether by violence or by disease."

And this is even stronger than would be required to sustain the claim of Tolson's dependents, because he did not have a disease.

The meaning of the word "injury" as used in workmen's compensation acts, or in a similar connection, has come before the courts for consideration on numerous occasions, and, while some have applied a limited and narrower meaning, many more have applied the rule of liberal construction.

Under the English Workmen's Compensation Act,

compensation was allowed only for "personal injury by accident," but this provision was very liberally construed by the English courts in a number of cases, such as *Brinton's, Ltd.,* v. *Turvey,* (1905) App. Cas., 230, where it is said that compensation was allowable for the injury sustained by a workman from anthrax contracted by him in handling infected wool, there being no violence other than that bacteria from the wool found their way into his system; and in *Scott* v. *Pearson,* (1916) 2 K. B., 61, where it is said that compensation was allowable for cattle ringworm contracted by an employee by coming in contact, not violent, with infected calves. Other similar cases the English courts have construed as "personal injuries by accident," thereby going much farther than it is necessary to go in the instant case to permit a recovery. In *Hurle's case,* 217 Mass., 223, 104 N. E., 336, L. R. A., 1916A, 279, Ann. Cas., 1915C, 919, where a workman tending furnaces for making gas claimed compensation for the loss of sight due to optic neuritis induced by poisonous gases from the furnaces, the injury was held compensable, and the Massachusetts act allowed compensation for "personal injury" without requiring it to be by accident.

In the instant case Tolson's blood and certain tissues of the body were injured, and he died, a stronger case than the above.

The case of *State, ex rel. McManus,* v. *Board of Trustees of Policemen's Pension Fund,* 138 Wis., 133, 119 N. W., 806, 807, 20 L. R. A. (N. S.), 1175, is of interest also. The Wisconsin act provided a pension to dependents of one "injured." In this case a policeman died of pneumonia from exposure,

and it was urged that by injury was not meant disease merely, and upon this point the court said:

"The word 'injury,' in ordinary modern usage, is one of very broad designation. In the strict sense of the law, especially the common law, its meaning corresponded with its etymology. It meant a wrongful invasion of legal rights and was not concerned with the hurt or damage resulting from such invasion. It is thus used in the familiar law phrase *damnum absque injuria*. In common parlance, however, it is used broadly enough to cover both the *damnum* and the *injuria* of the common law, and indeed, is more commonly used to express the idea belonging to the former word, namely, the effect on the recipient in the way of hurt or damage, and we cannot doubt that at this day its common and approved usage extends to and includes any hurtful or damaging effect which may be suffered by any one."

In *Pickett* v. *Pacific Mutual Life Ins. Co.*, 144 Pa., 79, 22 A., 871, 13 L. R. A., 661, 27 Am. St. Rep., 618, it was held that where deceased descended into the dug-out portion of a driven well to repair a pump, and in a few minutes died from asphyxia, due to some deadly gas therein, and the dug-out portion was but 10 or 12 feet deep, and deceased had no reason to suspect the presence of noxious gas therein, his death was due to external, violent, and accidental injuries, within the meaning of an accident policy insuring against that class of injuries.

And so these cases might be multiplied, beginning with indemnity insurance cases prior to the passage of Workmen's Compensation statutes, which companies insured, among other things, against "accidental injuries," somewhat similar to compensation

laws, but the business and operation of such companies being quite different from the administration of these statutes. The cases, however, construing "accidental injuries," are largely the same; in effect holding that death from monoxide gas is an accidental injury. All of which indicates clearly that Tolson sustained an "accidental injury," and it is worthy of note that no Ohio case thus far decides the precise point at issue here contrary to the claim of the Tolsons.

The appellate court of this district held in a case where an employee breathed gas fumes from an acetylene torch, where rails were being welded in a mine, and was injured by such fumes, that the injury was compensable.

A case decided by Mauck, J., sitting by designation in the Eighth Appellate District, holds a somewhat similar injury compensable, which was affirmed by the Supreme Court of Ohio, *Industrial Commission* v. *Polcen,* 121 Ohio St., 377, 169 N. E., 305.

A case worthy of note in this connection is *Hanak* v. *Industrial Commission,* 23 N. P. (N. S.), 41, 31 O. D., N. P., 405, where in the second proposition of the syllabus it is held:

"An employee who has suffered injury from the inhalation of acetylene gas, due to a defective hose connection, is entitled to compensation under the workmen's compensation act on the theory that his injury was due to an accident suffered in the due course of his employment."

True, the case of *Renkel* v. *Industrial Commission,* 109 Ohio St., 152, 141 N. E., 834, holds that *diseases* contracted in the course of employment, and not occasioned by or the result of physical injury, are not

compensable as injuries under Section 1465-68, General Code, but Renkel had tuberculosis, a disease of which he died after a somewhat lingering illness. Here Tolson did *not have* a disease, and the record does not so show.

The case of *Industrial Commission* v. *Cross,* 104 Ohio St., 561, 136 N. E., 283, is cited to sustain the contention of plaintiff in error, but there it is likewise to be noted that Cross, while in the employ of the city of Cincinnati, died of typhoid fever, a disease contracted by drinking water from a contaminated spring located in a park. Therefore that case is not controlling here, because it must be kept in mind that Tolson did *not* die of disease, but, to use the mildest terms possible, of an "injurious influence" potent enough to produce death. Nor does the case of *Industrial Commission* v. *Russell,* 111 Ohio St., 692, 146 N. E., 305, sustain the contention of plaintiff in error here, for in that case Russell became totally blind, and, quoting from the brief of plaintiff in error in the instant case, "The sight having been destroyed by his being required continuously to look into a most powerful ultra-violet ray * * * this caused a disease of the optic nerve and the loss of sight."

Therefore again the Supreme Court of Ohio was passing upon the question of "disease"—a disease which caused blindness, the approach of which extended over a somewhat lengthy period. But how different the instant case! Somewhat suddenly, on September 28th, Tolson was affected by some harmful bodily influence in the mine, almost immediately diagnosed by a physician as monoxide poisoning, with monoxide conditions, and died on October 7th.

However, the Supreme Court of Ohio, in *Industrial Commission* v. *Roth,* 98 Ohio St., 34, 120 N. E., 172, 6 A. L. R., 1463, has practically indicated its view upon the issue under consideration. The last proposition of the syllabus reads as follows:

"The accidental and unforeseen inhaling by an employee, in the course of his employment, of a specific, volatile poison or gas, resulting in injury or death, is not an 'occupational disease.' "

The point decided is that breathing poison gas is not an "occupational disease," though it result in "injury" or death, and thus breathing poison gas is recognized as an *"injury."* And that is the law of the case.

The foregoing practically determines the two important issues raised here, first, that Tolson did not die of disease; second, that he did die of "accidental injury."

But finally the Workmen's Compensation Law of Ohio, by its own terms, Section 1465-91, General Code, and by judicial sanction, is to be liberally construed. In *Roma* v. *Industrial Commission,* 97 Ohio St., 247, at page 250, 119 N. E., 461, 462, Nichols, C. J., in speaking for the court, says:

"A strict application of this rule would undoubtedly defeat the right of the plaintiff in error to recover, but in view of the peculiar circumstances which the record discloses, and the feeling which abides within this court that the remedies provided in the Workmen's Compensation Act for the benefit of injured parties should be construed and interpreted with the utmost liberality, we are constrained to hold that the appeal was filed in time."

But, waiving aside the foregoing, the spirit of

the Ohio compensation law, its purpose, its intent, indicate and favor a reasonably liberal construction, and, if that be true, it would be difficult to imagine a more meritorious claim than that of Tolson's dependents. The Ohio compensation law discards negligence, contributory negligence, etc., and all the common-law rules relating thereto, and this, of course, for the benefit of persons injured and the dependents of those killed. Therefore the claim of liberal construction is not a myth, a mere sentiment, but is fully justified. But the rule of liberal construction is not required to be applied in the instant case, only the rule of *reasonable* construction, having in mind that this mine was very poorly ventilated; that black blasting powder was used by Tolson and others for shooting coal; that it generates monoxide gas; that on the 28th day of September, 1926, Tolson, physically robust, went into the mine in his usual health; that he was shooting down coal; that he became ill, left the mine, stopped at a physician's office on the way home, was told by the physician that he had monoxide poisoning; that the physician and undertaker testified to his redness of face and other conditions produced by monoxide; that Lewellyn, Heatherington, and Wheatley testified that it was monoxide poisoning—Wheatley being a gas expert, and having made a study of it for eighteen years, testifying that monoxide gas is an invisible, odorless, noiseless, deadly poison, that destroys the oxygen-carrying power of the blood, the hemoglobin having two hundred and fifty times the affinity for monoxide that it has for oxygen, and monoxide destroying certain tissues of the body, causing "dizziness, weakness in the legs, increased

respiration, then depressed and irregular breathing, collapse, unconsciousness and death.''

To the thoughtful investigator of the interesting subject of monoxide gas, probably no treatise is more interesting than Public Health Bulletin No. 195, issued by the United States government, this year, 1930, somewhat briefly reviewing the whole subject—its history, occurrence, symptoms, diagnosis—from the middle of the fifteenth century to the present, with excerpts on the subject from Zangger, Lowy, Barcroft, Witter, Klebs, Murray, Ruge, Becker, Haldane, and many others, among them Dr. Sayers, Chief Surgeon of the United States Bureau of Mines. So many of its harmful effects on the human body are pointed out by these various authorities on the subject that they cannot here be discussed. Perhaps those most generally mentioned are the impairment of the blood, depressed breathing, and finally the injury of certain tissues of the body, due to high concentrations and consequent saturations of the blood, which are also injuries.

The most convincing thing that can be said in conclusion is that, as a result of monoxide poisoning, death came swiftly, surely, to Tolson, and, in the light of the facts and the record, as well as a long line of decided cases, there is no refuge from the conclusion that he died from an accidental injury. The judgment is therefore affirmed.

*Judgment affirmed.*

POLLOCK and ROBERTS, JJ., concur in the judgment.