This action was regularly instituted before the North Carolina Industrial Commission, and from an award of the hearing Commissioner and of the full Commission, an appeal was taken to the Superior Court of Haywood County where, upon a hearing, judgment was entered *Page 177 
confirming the award of the Industrial Commission. From the judgment confirming said award, the defendants excepted, assigned error and appealed to the Supreme Court.
It was in evidence on the part of plaintiff, that the condition of Charles A. Cabe's health was good when he went in the tunnel at 7 o'clock the night of 23 July to work. He was driving a gas dinkey or motor truck run by gasoline, used to pull five to ten muck cars, in and out of the tunnel hauling muck. The gas dinkey ran some 7,000 feet into the tunnel from where the muck was being removed. High explosives of dynamite were constantly being shot. Foul and irritating fumes were in the tunnel, since the tunnel had been "holed through," and the gases pretty much in there all the time. The smoke and gases would drift back and forth and would sometimes go one way and sometimes another. The smoke from the detonations would drift back and forth and there was no artificial means of ventilating the tunnel at that time. These safety means had been taken out. No exhaust or intake fans and no air shaft through the roof on the side where they were working. There were fumes in the tunnel from the gas dinkey and the presence from this kind of gas at the time the bottom was being disturbed — there were bad odors at all times. The blow gun blew the smoke up and it was very bad. The effects on a man in the proximity was, he would have severe headaches and become sick at his stomach, and he would vomit. This condition had been there in the tunnel prior to 23 July, 1929, ever since there had been a gas motor in there. There was a difference in the smell of the gas and the dynamite explosion, and these different odors and gases were present on the evening of 23 July, 1929. The morning of the 24th, Charles A. Cabe was very sick and told his brother "he was sick enough to die." He became unconscious and blind on the 24th, and died the next evening. He was vomiting and was pale and yellow.
Linden Cabe, a witness for plaintiff and a brother of Charles A. Cabe, testified, in part: "On the morning of the 24th, he said to hurry and get him home. He said he was going to die before he got there. He said he wassick on gas, sick enough to die. . . . He said we were running off the road, and the witness discerned that his eyesight was failing him. He kept saying we were going to run off. He talked out of his head. There were about 30 men in the crowd working right along together cleaning up muck. Three or four of them got sick. . . . On the 23rd they had been shooting dynamite. The quantity used was 12 or 18 holes. I used one-half stick about 20 inches apart about 20 or 30 shots. They were 3 or 4 feet deep. The high places were 12, 14 or 18 inches above the ordinary bottom. In some places only five inches. We *Page 178 
would put a hole down to grade and used about a quarter of a stick or half a stick. They would explode as many holes as they got ready. The most I remember was 24. They set off this many about 4 or 5 times. They would come about 2 and a half hours apart. When they started to set them off, we went back a little ways in the tunnel and then went right back. It was the orders to go back. I always went back and put up the lights, and if it was all right, I would call in the men. . . . Only three men made any complaint that I knew of. They complained of gas sickness and headache. . . . I told them that morning that gas and powder smoke was too heavy and not to get too hot, they might get knocked out, and they obeyed my orders. Sometimes we kept the gas dinkey running in the tunnel all the time. . . . The muck was blown up by an air gun. It was used to loosen the muck. It has been packed there a long time and had water running over. We could hardly loosen it up with a pick or shovel. We had to blow it up with an air gun and load it into cars. . . . We didn't use powder in the tunnel only dynamite. It had the smell of dynamite in it and a smell like the gas from the exhaust of the gas motor. We let the motor run in there."
Loney Cabe, testified, in part: Was foreman working in tunnel, and brother of Charles A. Cabe. "I went to work a little earlier than he (Charles A. Cabe). They had done some shooting that night. I don't remember how many shots, probably 30 or 40. About 15 to 25 shots at one time. After the shots the smoke would drift toward Sterling Creek until the air changed. . . . Before we broke through, there was a fan over the intake operated by electricity. It carried air in and would force the smoke back. . . . About midnight I first observed that Charles was sick. I went to the motor where he was lying and asked him what was the matter. He said he felt awful bad. Before that, his health had been good. He was lying on top of the motor. . . . I saw him as we were coming off next morning at quitting time. . . . His face on the outside was pieded. It was red and yellow. It was just red and yellow pieded. . . . We took him over to the car and then on home. He said, `let me lay down. I am sick enough to die.' He said hewas made sick from driving that motor. The gas or something like that. As we came on home up on the mountain he became unconscious and was talking out of his head. I could discern he was beyond knowing anything. . . . From the time we got Charles home on Wednesday afternoon, he was in an awful shape until he died. He was burning just like his lungs had been set onfire, and I couldn't start to explain it. He coughed up something from hislungs. It was different from anything I had ever smelled." *Page 179 
Dr. Grover C. Wilkes testified, in part: "I am a practicing physician and graduate of the North Carolina Medical School and Medical College of Virginia. I am licensed to practice in North Carolina. Have been practicing 14 years. Had two and a half years experience in the World War in this country and in France in the capacity of captain. I did everything in general medicine, very little surgery. General practice. In the army I took a special course and studied gas in school. I have, during recent months, had occasion to review authorities on the subject. That was before the death of these people. . . . I saw Charles A. Cabe on 24 July, 1929. Ifound him in a condition that I considered the result of carbon monoxidepoisoning. He became unconscious. He was prostrate. He was breathing very heavily when I saw him. His pulse was racing. His temperature was very slightly increased, and he was unconscious. . . . There has been two cases of carbon monoxide gas poisoning in the same family and they both died."
Dr. F. Angel testified for the claimants: "My name is Dr. Furman Angel. I live at Franklin and am 32 years old. I graduated at Jefferson Medical College in 1918. I spent 3 years in the U.S. Naval Service in the U.S. Naval Hospital, I returned to Philadelphia and spent 2 years and 6 months in the Pennsylvania Hospital. I practiced surgery in the Naval Hospital. I own a hospital of 70-bed capacity. I have the assistance of two doctors and 28 nurses, and perform about 1,400 major operations per year. I have been operating in this hospital since August, 1923. I had three years service in the Naval Medical Corps. My practice is confined to surgery at the hospital. I have no general practice at all. We treat all kinds of cases, but surgery is our specialty. In my practice I have occasion to treat persons suffering from carbon monoxide gas poisoning. I imagine I have treated in the neighborhood of a dozen cases since I have been practicing medicine. I was called to treat Linden Cabe in my hospital. I was called on and treated Charles A. Cabe at his home. At the time I saw Mr. Cabe, he was practically dead. I saw him about 5 hours prior to his death, the day before he died, I saw him in the afternoon and he died at 7 o'clock that evening. He had a great shortness of breath; a fast pulse; he was not synose, but had a very livid color, the color of a dying man. The symptoms present in a case of poisoning from carbon monoxide gas is the patient will have gastric distress, shortness of breath, fast pulse, and usually have a pink color, and one that persists after death. Headaches, nausea and vomiting are symptoms, seeing obstacles or illusions are symptoms. Some of the causes that produce or generate carbon monoxide gas are combustion of gas in some type of motor, that is the commonest. Dynamite blasts will *Page 180 
not produce much of it, that produces a nitrous gas. Dynamite will produce a deadly gas whether in confined space or not; it is worse in confined space. In such a tunnel as has been described in the evidence, it is myknowledge and experience that this gas will accumulate and remain in themuck. Either gas has an affinity for mud or muck. Pockets, known as air pockets, will form in a tunnel and the gas remains in those pockets indefinitely, and the gas has an affinity for that sort of place more than in the natural air. It is my opinion Charles A. Cabe died from some kind ofgas poisoning. I did not have a special test made to determine just what kind, but he died from gas poisoning."
R. S. Perry, testified for claimants, in part: "My residence is at Cove Springs, Ga. I am now engaged in the chemical business. I am in the chemical business and doing consulting work in mining and engineering problems. I am with a corporation, I am president of it. I was educated at Lehigh University in Chemical Engineering; and in the Royal School of Mines, in Saxony. I hold degrees from these colleges; I have no other degrees. I have special work in mining and metallurgy in Germany. The degree from Lehigh University is the degree of analytical chemistry in B. S. I am a life member of the American Institute of Mining and Metallic Engineering; life member of the Master Builders Association of Pennsylvania; I am a life member of the Educational Bureau of Paint and Varnish; I am a Fellow of the Institute of American Chemists; member of the Franklin Institute; member of the American Society of Testing Materials. Since I have been a grown man my profession has been that of paint, varnish, and consulting work and professional work in occupational and other poisonous gases and nuisances and mining work. As a mining engineer I have discovered and operated mines in Alabama, Georgia, Tennessee, Arkansas and Virginia. I have had experience in mines and other places where tunnels were being built, several tunnels in Georgia, Arkansas and Virginia. At present my engineering offices are at Atlanta." On cross-examination: "Q. Mr. Perry, with the headed-in condition with the draft of air blowing and this man riding in and out as stated to you; this man about midnight complained and said that he is sick and feels awfully bad, and tells his foreman that he does not believe that he can work on until morning, but does; he goes in and out of the tunnel with the dinkey a number of times between then and morning; at 7 o'clock his shift goes off; he goes to his quarters and goes to the dining room; he sits down behind the stove and says he is sick enough to die; he says that he is about to freeze to death, chilly, he declines to eat any breakfast; he vomits on two occasions; says he is sick enough to die; an hour elapses and he goes up to the top of the mountain; he is weak *Page 181 
in the legs; he does not keep up with the other men; he gets in an automobile at 9 o'clock in the morning, conscious; he is pale and is a whiteish looking color; he says he is deathly sick; he believes he is going to die; he wanted his brothers to carry him home; he was driving in fresh air until 10:30; he said to look out, you were running off the bank, he was driving in the air 70 or 80 miles; he had a doctor sometime between the time he arrived home that evening and the next evening when he died; he wakes up and recognizes that he is home; he says `I am at home'; he was perfectly conscious; when the doctors talked to him he is able to recognize folks; he talked perfectly rational; he died at seven o'clock in the evening; is it your opinion that he died from the effect of one or more poisonous gases? A. Accepting contravening evidence, which I heard, I would conclude that he died from the effect of one or more poisonous gases. Q. Leaving out the other facts? A. My opinion is that he died as stated. Q.From carbon monoxide gas? A. From the effect of one or more poisonousgases. Q. What other? A. Carbon monoxide; nitrous oxide. . . . Q. If a man dies from the effects of carbon monoxide gas poisoning it will show in the blood taken from the body the morning before he died; the test the chemist made showed absolutely no poison from carbon monoxide in the blood; would that not indicate strongly that he died from some other cause? A. It is purely negative; there is no reason to suppose that carbon monoxide will remain in the hemoglobin or the blood. Q. Experts here made the statement that it would show; and the chemist found negative in the blood. A. If they found carbon monoxide in the blood it would be positive; if they did not discover it it would be negative. Negative means that they just did not discover it. Negative as used here means `failure to discover.'"
Upon a hearing in the court below, a judgment was entered sustaining the award of the Industrial Commission. The defendants excepted, assigned numerous errors and appealed to the Supreme Court. The material ones will be considered in the opinion.
The findings of fact and award by the North Carolina Industrial Commission is as follows: "It is admitted and found as a fact by the Commission that carbon monoxide gas can be produced by the improper combustion of gas and other explosive liquids and gas detonation; and that it is found in the excessive gas exhaust from a gas engine when idling in large quantities; that it is also found that *Page 182 
the explosion of dynamite produces both carbon monoxide and nitrous monoxide gases. Upon consideration of all the evidence the Commission finds as a fact: That the claimant at the time of the alleged accident was in the employ of the defendant. . . . That the accident and injury to the plaintiff arose out of and in the course of his employment and that his death was the direct result of poisoning from carbon monoxide or nitrous monoxide gas involuntarily inhaled in the Cataloochee Tunnel."
The defendants contend: First, was there sufficient competent evidence to sustain the findings of fact and the award in this case? We think so. "The findings of fact by the Industrial Commission in a hearing before them is conclusive on appeal when there is sufficient competent evidence to sustain the award." Williams v. Thompson, 200 N.C. at p. 465.
The defendants contend: Second, was there any evidence of an accidental injury resulting in the death of the deceased? We think so. Charles A. Cabe was working for defendant in the Cataloochee Tunnel, on the night of 23 and 24 July, 1929, and it was contended that he died on 25 July, 1929, from the effects of carbon monoxide or nitrous oxide gas poisoning.
The Cataloochee Tunnel extended from the mouth of Cataloochee Creek to Waterville, a distance of seven miles, and was 12 feet 8 inches high, and 11 feet wide. At the time of the accident, there were four crews, of about thirty men each, working in the tunnel, approximately 2,000 feet apart, and the crews worked day and night. There were two gasoline engines or motor trucks working in the tunnel, one coming in and going out from each end, at intervals of about eighteen minutes. The trucks were ordinary motor trucks, running on an iron track, and pulled from five to ten cars and were used to haul concrete into and muck out of the tunnel. At intervals of about two and a half hours during the day, and all through the night of 23 July, 1929, thirty or forty shots and between twelve and eighteen holes of dynamite were exploded in the tunnel. At the time of the injury to the deceased, the tunnel had been "holed through," which is to say that the two crews that began to bore the tunnel from each side of the mountain had met in the middle, and all artificial ventilation had been removed. On the morning of 24 July, 1929, shortly after midnight, the deceased, while engaged in operating one of the gas dinkeys or motor trucks, and after having worked in the tunnel since seven o'clock of the evening of 23 July, complained of being sick, and was discovered by his brother lying upon top of the truck inside of the tunnel, while the cars were being loaded with muck. Before quitting time, at about seven o'clock, on the morning of 24 July, he again complained of being sick, and said he *Page 183 
would have to be taken home. Upon arrival at his home, a doctor was called, and on the following day, 25 July, 1929, he died.
The plaintiffs contended, and offered evidence tending to prove, that the death of Charles A. Cabe was caused by poisoning from carbon monoxide or nitrous oxide gas. The defendants, on the other hand, contended that the death of deceased was not caused by carbon monoxide or other gas poisoning, but that his death was due to some disease. Upon these conflicting contentions, the Industrial Commission found as a fact that the death of the deceased "was the direct result of poisoning from carbon monoxide or nitrous oxide gas involuntarily inhaled in the Cataloochee Tunnel." Opinion reported in Volume II of the Opinions of the North Carolina Industrial Commission, at page 8.
The findings of fact were sustained by the court below, and we think there was ample evidence.
All of the evidence which we have recited above was unobjected to, and it discloses (1) That Charles A. Cabe was a healthy man when he went into the tunnel to work at 7 o'clock the evening of 23 July. At 12 o'clock he was sick and continued so until quitting time next morning at 7 o'clock, then he was very sick and wanted his brothers to hurry and get him home. He said "He was sick on gas, sick enough to die." "He said he was sick fromdriving that motor" (the gas dinkey). He had illusions, was unconscious, blind and talking out of his head, vomiting, his coloring and many other known symptoms were those of gas poisoning. His brother said "He wasburning just like his lungs had been set on fire." "He coughed up somethingfrom his lungs." Dr. Grover C. Wilkes, a physician of more than ordinary experience, testified "I found him in a condition that I considered the result of carbon monoxide poisoning." Dr. F. Angel, a physician of great experience, testified: "It is my opinion Charles A. Cabe died from somekind of gas poisoning . . . but he died from gas poisoning." R. S. Perry, a mining engineer, of much experience, testified: "Q. From carbon monoxidegas? A. From the effects of one or more poisonous gases. Q. What other? A.Carbon monoxide, nitrous oxide." (2) That before the tunnels had been "holed through," there were artificial measures of ventilating the tunnel, but on the night of the 23rd and 24th, and some time prior, they had been taken out. The smoke and gases would drift back and forth. About every two and a half hours large quantities of dynamite were put in the holes and shot. The muck was blown up by an air gun and loaded on muck cars, a gas dinkey or motor truck run by gasoline, hauled the muck cars, and was driven by Charles A. Cabe. There was stench and a deadly gas from muck that was being blown up. There were fumes from the gas dinkey, which sometimes was kept *Page 184 
running in the tunnel all the time. Foul and irritating fumes in the tunnel since it had been "holed through." About midnight Charles A. Cabe was lying on the top of the motor feeling "awful bad," but he worked on until quitting time, 7 o'clock, then was heard his pitiful wail "sick on gas, sick enough to die." Three of the men "complained of gas sickness and headaches." We think there was ample evidence to sustain the ruling of the court below upholding the finding of the Industrial Commission. The defendants introduced evidence, but under our practice in this jurisdiction, it is the well settled rule and accepted position that, on motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
Public Laws 1929, chap. 120, known as the "Workmen's Compensation Act," sec. 2(f), is as follows: "`Injury' and `personal injury' shall mean only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident."
We think the evidence clearly indicates that Charles A. Cabe sustained an injury by accident arising out of and in the course of his employment. The evidence negatives that it was an occupational disease. Matthiessen Hegeler Zinc Co. v. Industrial Board, 284 Ill. 378, 120 N.E. 249; Cityof Joilet v. Industrial Commission, 291 Ill. 555, 126 N.E. 618.
The case of Industrial Commission v. Tolson, 37 Ohio App. 282,174 N.E. 622, is similar to the case at bar. There a miner who had always been healthy, strong and vigorous, after firing a shot or shots, in the common parlance of mining affairs is known as the process by which coal is loosened, became ill, left the mine and went to a doctor and from there went to his home and died a few days later. The doctor testified that he was suffering from monoxide poisoning; that he had every appearance of it, a flushed face, and other conditions that follow such poisoning. The principal question with which the court was concerned in this case was whether monoxide poisoning was an accidental injury within the provisions of the Workmen's Compensation Act. It was held that such an injury was accidental and that poisoning from carbon monoxide gas was not an occupational disease.
The defendants contend: (3) "Is the right to have an autopsy, granted under section 27 of the North Carolina Workmen's Compensation Act, a matter within the discretion of the North Carolina Industrial *Page 185 
Commission and/or can claimants recover where they have denied the right of autopsy?" We think under the facts and circumstances of this case the carrier had no right to have an autopsy.
Laws 1929, supra, sec. 27, the latter part is as follows: "The employer, or the Industrial Commission, shall have the right in any case of death to require an autopsy at the expense of the party requesting the same."
The defendant, Travelers' Insurance Company, requested of the North Carolina Industrial Commission an autopsy of Charles A. Cabe, deceased. The plaintiffs' attorneys wrote the Insurance Company refusing to give consent, and said: "Upon due investigation of the law, we are of the opinion that there is a wide difference between an autopsy, pure and simple, and a post-mortem examination to be made after interment. We are, therefore, advising our client to resist your request for disinterment. The body of the deceased was interred on 24 July, 1929, more than one month ago, and in view of the fact that the body was not embalmed, together with sentimental reasons, the widow and other members of deceased's family, are seriously emphatic in their refusal of a disinterment."
The defendants contend that "The court erred in denying the defendants' motion for an autopsy, upon the following findings of fact by the court below: `That, on 24 August, the defendant carrier requested in writing of John C. Buchanan, administrator of the estate of Charles A. Cabe, deceased, and guardian of his widow, the right to have an autopsy performed; that, on 27 August, Messrs. Alley Alley, attorneys for the widow and attorneys for the guardian of the widow and the administrator of the estate, wrote the defendant carrier denying the request, and copy of which letter is hereto attached and made a part of the record hereof; copy of which letter was forwarded to the Industrial Commission; that there was no formal request made upon the Industrial Commission for an autopsy until the case was called for hearing in Waynesville on 8 November, 1929; that the deceased, Charles A. Cabe, was buried on the evening of 27 July, 1929, in a wooden coffin, and without having been embalmed; that an autopsy at this time would not reveal the cause of the death of Charles A. Cabe, and further that an autopsy on 17 August, the date of the request upon the widow of the deceased, would not have revealed the cause of the death of Charles A. Cabe.' Upon the foregoing findings of fact, the Commissioner, in his discretion, denies the motion of the defendants for an autopsy, and the defendants duly excepted and assigned error. We do not think the exception and assignment of error can be sustained.
In 17 C. J., at p. 1139-40, under the subject of "Dead Bodies," we find the following statement: "Except in cases of necessity or for *Page 186 
laudable purposes the policy of the law is that the sanctity of the grave should be maintained, and that a body once suitably buried should remain undisturbed. . . . There is a distinction between the rights existing prior to burial and those after burial; because after its interment the body is in the custody of the law, and a disturbance of its resting place and its removal is subject to the control and direction of a court of equity in any case properly before it. The right to have a dead body remain unmolested is not an absolute one; it must yield where it conflicts with the public good or where the demands of justice require such subordination. A court willnot, however, order a body to be disinterred unless there is a strongshowing that it is necessary and the interests of justice require it."
(Italics ours.)
In the case of Thompson v. Deeds, 93 Iowa 228, 230, 35 L.R.A., 56, it is said: "A proper appreciation of the duty we owe to the dead, and a due regard for the feelings of their friends who survive, and the promotion of the public health and welfare, all require that the bodies of the dead should not be exhumed, except under circumstances of extreme exigency."
"Civilized countries have always recognized and protected as sacred the right to Christian burial and to an undisturbed repose of the human body when buried. The unauthorized disinterring of the body of a deceased human being is an indictable offense both at common law and by statute, regardless of the motive or purpose for which the act is done." 8 R. C. L., part sec. 16, at p. 694, C. S., 4320, 4321, 4322; S. v. Wilson, 94 N.C. at p. 1020; Humphrey v. Church, 109 N.C. 132; S. v. McLean, 121 N.C. 589, 42 L.R.A., 721.
The conduct of the Insurance Company, the carrier, in this action, does not appeal to a sense of justice. The carrier requested the North Carolina Industrial Commission to exhume the body of Charles A. Cabe sometime after he was buried. We find nothing in the statute giving the right. All the evidence in this action, taking a common sense view of the record, shows that the employer did not in the exercise of due care, provide for its employee Charles A. Cabe a safe place to work. He and his brother were both killed by the deadly gas in the tunnel and others were made sick. The expert witnesses of plaintiffs and defendants may differ, but the admitted facts cannot be ignored. From the testimony of plaintiff's expert witnesses, the blood test is not always controlling. We think the Industrial Commission on the facts had the right to deny the Insurance Company, the carrier, an autopsy. Ordinarily this is a matter of discretion when applied for by those having the right.
One of the primary objects and purposes of compensation laws is to grant certain and speedy relief to injured employees, or, in case of death, to their dependents. The deceased was killed about two and a half years *Page 187 
ago, and this proceedings was instituted shortly after his death in an effort to collect the compensation that his widow is entitled to. This delay is unjustifiable. It is not righteous for the carrier to delay payment so as to force an indigent or poor person to take less than the law allows under the act. From a careful review of the record, the judgment below is
Affirmed.