(No. 15754.—Judgment reversed and award set aside.)

THE PERU PLOW AND WHEEL COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(ARTHUR ROUSO, Defendant in Error.)

*Opinion filed February 19, 1924.*

1. WORKMEN'S COMPENSATION—*ordinary meaning of word "accident."* No exact legal definition can be given of the word "accident," but in its ordinary acceptation it includes those things which happen without design or any event unforeseen or not expected by the person to whom it happens.

2. SAME—*meaning of words "accident" and "accidental injury" in Compensation act.* The words "accident" and "accidental injury," as used in the Compensation act, were meant to include every injury suffered in the course of employment for which there was an existing right of action at the time the act was passed, and the act extends the liability of the employer to pay compensation for injuries for which he was not previously liable and fixes the limit of such compensation.

3. SAME—*occupational diseases are not covered by Compensation act.* Occupational diseases are not covered by the Compensation act, but all diseases are not excluded from the purview of the act.

4. SAME—*what is an occupational disease.* An occupational disease is not an accident but is a diseased condition arising gradually from the character of the work in which the employee is engaged.

5. SAME—*distinction between accident and occupational disease.* An accident, as distinguished from an occupational disease and as contemplated in the Compensation act, arises from some definite event the date of which can be fixed with certainty, which is not true of an occupational disease; but not every disease is occupational simply because the conditions which were the immediate cause of the injury obtained for a long period of time.

6. SAME—*injury must be traceable to definite time and place of origin.* For a disability to be the result of an accidental injury it must be traceable to a definite time and place of origin, as it is impossible to give the required notice unless such definite time can be ascertained.

7. SAME—*when disability is result of an occupational disease.* Where the evidence in the record shows that the disability of an employee arose out of continued breathing of iron dust in his par-

ticular occupation, and there is nothing in the record from which the time when the disability began can be fixed, such disability is not the result of an accident but of an occupational disease. (*Matthiessen & Hegeler Zinc Co.* v. *Industrial Board,* 284 Ill. 378, distinguished.)

WRIT OF ERROR to the Circuit Court of LaSalle county; the Hon. EDGAR ELDREDGE, Judge, presiding.

R. P. GARRETT, for plaintiff in error.

LEE O'NEIL BROWNE, for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

Defendant in error, Arthur Rouso, filed a claim with the Industrial Commission for compensation for injuries arising out of an accident alleged to have occurred in his employment with plaintiff in error. There is no controversy as to the relations of the parties, the questions in dispute being whether or not there was an accident, whether notice was given as required by law, and the nature and extent of the disability. No testimony was offered on behalf of plaintiff in error either before the arbitrator or before the commission on review, it being contended by it that the disability of Rouso was not an accident but a disease.

The record of evidence offered by the applicant shows that he is thirty-four years of age; that prior to the 17th day of February, 1921, when he first went to the hospital, he had worked for plaintiff in error for five years as a machinist, operating a lathe used in boring out or enlarging the inside of metal wheel hubs. Prior to that time he had been employed as a machinist in other shops and in the cement mills at Oglesby. The operation of the machine upon which he worked for plaintiff in error caused a fine metal dust to arise from the iron upon which he was working. This dust was sufficiently light to float in the air and was discernible in the sunlight. From this dust the

clothes of workmen would turn yellow with rust. There being no appliances for the purpose of carrying this dust away, it was inhaled by the workmen. Rouso, at the time he quit working for plaintiff in error, on the 17th of February, 1921, was in what he characterized a "run down" condition, unable to sleep or eat, coughing continually, occasionally raising blood and frequently a mucous sputum which the medical witnesses termed mucopurulent,—*i. e.,* made up of mucous and pus. Rouso remained in the hospital for about nine days. Thereafter he returned to the plant of the plaintiff in error and told the foreman under whom he worked and the cashier of the company that he did not know when he could come back to work, as the doctor had told him to stay away from work and go west. His testimony shows, however, that he did return and try from time to time to work for a period of about six weeks thereafter but was unable to work more than a few days at a time. After about forty days of work put in in this manner he quit permanently and went to a sanitarium near Ottawa operated for the treatment of tuberculosis, at that time telling the foreman why he was quitting. His last work for plaintiff in error was on June 27, 1921. He testified that he was unable to work; that he was too weak and short of breath; that in the mornings at times he would be so weak that he was unable to move. From that time until the first day of July, 1922, he made no attempt to engage in employment and the evidence shows he was unable to do so. During July, 1922, he was given a position as ticket taker for the Tri-Cities Charities, who were operating the scenic park known as Deer Park, near Ottawa. He was employed there for a period of two months, taking admission fees of visiting tourists at the entrance to the park and issuing tickets to them. For this work he was paid the sum of $3.25 per day. His work employed him seven days a week. He testified on hearing before the commission that he felt better than he had at the time of

the hearing before the arbitrator and was receiving no medical attention but that he could not do any physical labor.

Dr. Roswell Pettit, who conducts the tuberculosis sanitarium near Ottawa, made a thorough examination of Rouso, using X-ray, sputum and blood tests and other tests known to the medical profession. He testified that Rouso was unable to work and that he believed his condition was permanent. He also testified the condition found in his lungs could be produced by a hard, cutting dust, which would irritate the mucous membrane, but that soft dust, such as coal, chalk or cement, would have little or no damaging effect. Dr. A. J. Roberts, director of the LaSalle County Sanitarium at Ottawa, had Rouso under his observation for four months. He testified as to his condition and that he was unable to do any manual labor; that at the time of the hearing before the commission he had seen no difference in his condition. Both physicians testified that they found no evidence of tuberculosis but that Rouso had an inflammation of the lungs, probably due to breathing this dust. The record also shows that prior to six months before he quit work in February, 1921, he was never known to lose time by reason of sickness; that he was what some of the witnesses characterized as a "husky" man; that during the six months prior to February 17, 1921, he had a hacking cough and lost flesh. The record does not disclose that anything unusual occurred in the work of Rouso at any time prior to February 17, 1921. The evidence also tends to show that it is not usual for men engaged in the occupation that Rouso was following to be affected by iron dust in the manner in which Rouso was affected, although it is shown by the medical testimony that the irritation set up in the lungs of Rouso by the iron dust was but a natural result of breathing hard, cutting dust.

The first question to be determined is whether or not this is an industrial accident or an occupational disease.

An "accident" has been defined by the English courts as any unexpected personal injury resulting to the workman in the course of his employment, from any unlooked for mishap or occurrence arising out of the employment. (*Fenton* v. *Thorley & Co.* 5 B. W. C. C. 1.) It is the view of this court, as expressed in numerous cases, that the word "accident" is not a technical legal term. No legal definition has been given or can be given which is both exact and comprehensive as applied to all circumstances. Those things which happen without design are commonly called an accident,—at least in the popular acceptation of the word. Any event unforeseen, not expected by the person to whom it happened, is included in the term. In *Matthiessen & Hegeler Zinc Co.* v. *Industrial Board,* 284 Ill. 378, this court defined the term "accident" as follows: "The words 'accident' and 'accidental injury' imply, and the provisions for notice to the employer within thirty days after an accident and his report to the Industrial Board of accidental injuries show, that an injury, to be accidental or the result of an accident, must be traceable to a definite time, place and cause, but if there is such a definite time, place and cause and the injury occurs in the course of the employment the injury is accidental within the meaning of the act and the obligation to provide and pay compensation arises. While it is not intended, and perhaps not possible, to give a definition of the words used in the act as applied to all possible circumstances, it may safely be said that an injury is accidental, within the meaning of the act, which occurs in the course of the employment unexpectedly and without the affirmative act or design of the employee."

The words "accident" and "accidental injury," as used in the Compensation act, were meant to include every injury suffered in the course of employment for which there was an existing right of action at the time the act was passed, and to extend the liability of the employer to make compensation for injuries for which he was not previously

liable and to fix the limit of such compensation. (*Matthiessen & Hegeler Zinc Co.* v. *Industrial Board, supra; Baggot Co.* v. *Industrial Com.* 290 Ill. 530.) Occupational diseases are not covered by the Compensation·act, although not all diseases are to be excluded from the purview of the Compensation law. An occupational disease is a diseased condition arising gradually from the character of the work in which the employee is engaged. It does not occur suddenly but is a matter of slow development. An occupational disease is not an accident. (*Matthiessen & Hegeler Zinc Co.* v. *Industrial Board, supra; Labanoski* v. *Hoyt Metal Co.* 292 Ill. 218; *Jerner* v. *Imperial Furniture Co.* 200 Mich. 265.) An accident, as distinguished from an occupational disease, as the former is contemplated under the Compensation law, arises by some definite event the date of which can be fixed with certainty but which cannot be so fixed in the case of occupational diseases. (*City of Joliet* v. *Industrial Com.* 291 Ill. 555; *Matthiessen & Hegeler Zinc Co.* v. *Industrial Board, supra.*) It was said in the case last cited: "It is true that Adrian had been exposed to practically the same conditions for many years without injury, but it would not be unreasonable to conclude that his immunity was because of the state of his health and his ability to resist the deleterious effects of the gases and fumes over which he worked. But this time his physical condition was such as to make him susceptible to arsenical poisoning in such a degree as to bring on his fatal illness and death."

From what has been said it will be seen that not every disease is occupational simply because the conditions which were the immediate cause of the injury obtained for a long period of time. Certain diseases are well recognized as being attributable to accident, such as those caused by the entering of a disease germ through breaking of the skin, as anthrax. (*Chicago Rawhide Manf. Co.* v. *Industrial Com.* 291 Ill. 616.) Actinomycosis,—a disease caused by handling wheat and barley,—has been held to be an accidental

injury. (*Hartford Accident and Indemnity Co.* v. *Industrial Com.* 32 Cal. App. 481.) Disability, caused from inhaling poisonous fumes in attempting to put out a fire. (*Munn* v. *Industrial Board,* 274 Ill. 70.) Paralysis, caused by exertion of a traveling salesman in running to catch a train while carrying heavy hand luggage. (*Crosby* v. *Thorp Hawley Co.* 206 Mich. 250.) Nephritis, caused by exposure of the employee after working in heat and steam. (*United Paperboard Co.* v. *Lewis,* 65 Ind. App. 356.) Eczema, caused by exposure to fumes and splashes of carbon bisulphide. (*Evans* v. *Dodd,* 5 B. W. C. C. 305.) Rheumatism and gangrene, following an injury caused by dropping a heavy weight on the foot. (*Stinton* v. *Brandon Gas Co.* 5 B. W. C. C. 426.) It has been held that illness caused to a seaman by general exposure to rough weather could not be held to be an injury by accident, (*Barbeary* v. *Chugg,* 8 B. W. C. C. 37,) and that the death of a stoker following a gradual collapse from exhaustion induced by work for several days in the tropical heat of the Red sea was not death by accident. *Pyper* v. *Manchester Liner,* 2 K. B. 691.

The rule recognized in this State is, that in order that the disability be by reason of an accidental injury or the result of an accident it must be traceable to a definite time and place of origin. There must be some definite thing happen which can be pointed to as the immediate cause of the breakdown, although the employee may have been able to work in similar conditions for a considerable period of time prior to the happening of the event which was the immediate cause of his breakdown. That this must be considered the intention of the legislature in passing the act is shown by the provisions of the act limiting the time in which notice may be given to the employer. If a definite time cannot be ascertained it is impossible to give the notice required by the act.

*Matthiessen & Hegeler Zinc Co.* v. *Industrial Board, supra,* is cited and relied upon by both parties to this law-

suit.  In that case the employee had followed his occupation of dragging out molten cinders for a number of years without detrimental results.  Prior to October 6, 1914, he was in his usual health.  He began work at six o'clock on that day and when leaving home complained that he did not feel like going to work.  He worked, however, until two o'clock in the afternoon, when he went home sick.  About eight o'clock that night he was seized with cramps, and from then on the progress of lead and arsenical poisoning was rapid.  He was taken to the hospital on October 12 and died on October 14.  The opinion in that case holds, as we have seen, that the arsenical poisoning which resulted in his death was contracted on October 6.  There is nothing in this record to which we can point as showing the time when the disability of Rouso began.  From all that appears in the record in this case his disability arose out of continued breathing of iron dust in his particular occupation.  It appears from the medical testimony to be a characteristic and natural result of continued inhalation of iron dust.  There is not one circumstance, incident or time to which we can point as the starting place of his disability.  While the record shows that up to six months prior to February, 1921, Rouso was in good health, there is no incident or time within said six months' period which is shown in the record to be the cause or starting point of his disability, and applying the rule laid down in the cases here referred to, we are forced to the conclusion that this most unfortunate disability of the defendant in error did not arise out of an accidental injury but is a disease of his occupation.  This being true, the commission was not justified in entering an award for an accidental injury and the circuit court erred in confirming that award.

The judgment of the circuit court will therefore be reversed and the award set aside.

*Judgment reversed and award set aside.*