**WILSON & CO., Inc., v. McGEE et al.**

No. 23383. Opinion Filed April 18, 1933.

C. D. Bennett, for petitioner.

John F. Amos and J. I. Gibson, for respondents.

BAYLESS, J. George McGee worked for Wilson & Company in one of its meat freezing plants at Oklahoma City. He quit working for this company about the middle of 1931, after he had been so employed for 14 years. He filed with the State Industrial Commission of the State of Oklahoma an "employer's first notice of injury" November 10. 1931, setting out that the accident occurred August 5, 1931, and that he quit work on account of the injury August 7, 1931. The cause of the accident was given in this report as: "While working in freezer, froze my hands—frozen fingers of both hands and part of the hands." The employer, carrying its own risk, filed an answer November 19, 1931, admitting the employment up to July 11, 1931, but denied employment since that date, and denied that an accidental injury occurred to McGee during the employment. The matter was heard at Oklahoma City on February 5, 1932, and an award made in favor of McGee, from which this appeal is taken. McGee will be referred to herein as claimant and Wilson & Company as employer, the

respective positions in which they appeared before the Commission.

The undisputed evidence in the record shows that for about seven years prior to the time claimant quit working for the employer, he had worked in a freezer, into which meat was taken, stored, frozen, and taken out as needed. His duties consisted of handling this meat. The temperature of the various rooms of this freezer was kept constantly at a uniform degree; the temperature of the sharp freezing room being from zero to 15 below; the temperature of the storage room being from zero to 15 above; and the temperature of the shipping room being 34 degrees above. The evidence shows that claimant wore many thicknesses of clothes and used his own judgment as to when he was comfortably clad. The evidence shows that he passed to and fro between these rooms constantly during each 8-hour work day. The evidence is somewhat uncertain as to when claimant quit working for employer, but this is immaterial in our view of the case.

With this preliminary statement, of the evidence of the conditions in which claimant worked, we now pass to the testimony of the claimant himself as to his ailment. He was the only witness testifying as to his physical condition and the development thereof, except the medical experts who gave their opinions concerning it. We deem it best to set out pertinent parts of his testimony, as follows:

"Q. While you were working in the freezer, did anything unusual happen to you? A. It didn't until it started hurting on my finger. Q. All right, state what happened to you? A. I was working in there and after so long a time my fingers began to get sore—hurting on the end. Q. How did your fingers look? A. They looked kinda red-bluish-black right across there. Q. The tips? A. The tips. Q. How did they feel? A. They felt tight and numb; there wasn't much feeling in them. Q. When did you first notice that? A. Well, I think, as nigh as I could get at it, it was year before last when I first noticed that—along toward the last of the year. Q. Which finger is that? A. The second finger of the left hand."

Then follows testimony concerning treatment received for the finger.

"Q. Then did you continue to work in the ice box? A. I worked on there. Q. Did you have any more trouble with your hand? A. Not until, you see, it kept getting worse and worse. Q. Through that year and a half? A. No, through that year, but this last past

year, it got worse and worse. Q. When did you notice it the second time? A. Well, I noticed it got really bad; it was bad enough then. Q. What time of the year was that, George? A. I don't know, I believe it was along in June or July. * * * Q. Of 1931? A. Yes. Q. All right, tell the court what happened that time; how each hand felt and all about it? A. Well, it just felt dead and numb right across the ends of the fingers. Q. Was that on both or one hand? A. It is on the forefinger and on the middle finger of the right hand. Q. Well, did you have any trouble with your left hand? A. Well, I had some with that little finger and the middle finger. Q. On the left hand? A. Yes, they was the only two I had any trouble with on that hand. Q. Now, describe how your hands felt at that time. A. Oh, they just felt cold and dead; there was no feelings in them. Q. Did you notice that on one day or was it gradual? A. Well, it was gradual, but on Saturday when I quit at noon, it just got worse; but it came down on my finger at once and I worked until noon. It just got worse; it all came down on my finger at once, and I had to pull the truck in the palm of my hand. * * * Q. Now, George, you say after the tenderness came in the middle finger of the left hand, sometime later you discovered a tenderness in the third finger and first finger of the right hand at the ends, is that right? A. That one and this one hurt, yes. Q. And they gradually got worse? A. Yes. Q. You say this condition came on you gradually? A. Yes, sir. Q. And after a while it got so bad you couldn't work? A. That is right. Q. And then you quit work? A. Yes, sir. Q. And you have had a part of the end of the 3rd finger on your right hand taken off? A. Yes, sir. * * * Q. I say, you didn't have any accident to your hand? A. No. * * * Q. You didn't have any hurt to either of these hands or either of these fingers, except just as you have described in this hearing? A. No, sir, I did not."

The claimant testified further that he wore gloves; that they became wet daily in the work and froze while on his hands. The claimant's family physician testified that he examined claimant some time before the hearing; that claimant told him he had frozen his fingers while at work, and in the opinion of the physician, the fingers and hands had been frostbitten due to working with wet gloves in the extreme cold temperatures. This physician gave his definition of an occupational disease, but denied that claimant's trouble was an occupational disease.

Two physicians testified for the employer and gave their opinions of claimant's condition as being due to trophic causes.

Upon this record the Commission found

that claimant had sustained an accidental injury in the course of his employment and awarded compensation for partial disability to the hands. The employer prosecutes this review and presents the sole question that the evidence is insufficient to show that the claimant suffered an accidental injury arising out of and in the course of the employment within the contemplation of the Workmen's Compensation Law. The claimant has filed his brief, contenting himself with asserting that the award is supported by some evidence, and that this court should not disturb the award.

An accidental injury within the meaning of the Workmen's Compensation Law is defined by this court to be:

"The term 'accidental injury,' as used in the act, must not be given a narrow meaning, but, according to the great weight of English and American authorities, the term is to receive a broad and liberal construction, with a view of compensating injured employees, where the injury results through some accidental means, was unexpected and undesigned, or may be the result of mere mischance or of miscalculation as to the effect of voluntary actions." Winona Oil Co. v. Smithson, 87 Okla. 226, 209 P. 398.

An occupational disease within the meaning of the Workmen's Compensation Law is defined by this court as follows:

" * * * An occupational disease being a diseased condition arising gradually from the character of the employee's work, but it is not an 'accident.' " Vaughn & Rush v. Stump, 156 Okla. 125, 9 P. (2d) 764.

It is sometimes difficult to determine whether an employee's condition results from an "accident," or an "occupational disease." We have said in Vaughn & Rush v. Stump, supra, adopting the language of the Supreme Court of Massachusetts in Re Patrick Sullivan, Claimant, [Mass. Bonding & Ins. Co., Insurer, Appt.], 164 N. E. 457, 62 A. L. R. 1458, when it said:

"The physical condition resulting, and not the nomenclature, is the decisive factor in determining whether a so-called disease is a compensable personal injury."

The test which we have heretofore attempted to apply to the facts in distinguishing between an accident and an occupational disease is laid down in Vaughn & Rush v. Stump, supra, and I. T. I. O. Co. v. Sharver, 157 Okla. 117, 11 P. (2d) 187, to be:

"An 'accident,' as contemplated by the Workmen's Compensation Law, is distintinguished from an occupational disease, in that it arises by some definite event, the date of which can be fixed with certainty, but which cannot be so fixed in the case of occupational disease."

If we take the first date given by the claimant as being the definite event, or the date certain on which his ailment began or occurred, the statute of limitations had run against the cause of action before he filed his claim, for the claimant himself fixes that date as having been a year and a half prior to that time. We cannot well say that the accidental injury occurred on the day he quit, for, according to his own statement, it was a condition long in existence, that it had gradually become worse, and at that time became so bad that he could no longer work.

The Supreme Court of Illinois, in the case of Peru Plow & Wheel Co. v. Ind. Comm., 311 Ill. 216, 142 N. E. 546, said:

"The rule recognized in this state is that, in order that the disability be by reason of an accidental injury or the result of an accident, it must be traceable to a definite time and place of origin. There must be some definite thing happen which can be pointed to as the immediate cause of the breakdown, although the employee may have been able to work in similar conditions for a considerable period of time prior to the happening of the event which was the immediate cause of his breakdown."

See, also, United States Gypsum Co. v. McMichael, 146 Okla. 74, 293 P. 773.

The claimant's own physician says that his condition is that of frost-bite brought about by working with wet gloves in extreme temperatures. This was not an unusual occurrence, but was a daily occurrence over a period of 7 years. The claimant's physician does not attempt to say that it is the result of one freeze or of a series of freezes. The evidence shows that the claimant was daily subjected to this condition for this 7-year period of time, and we believe that the case of Imperial Refining Co. v. Buck. 155 Okla. 25, 7 P. (2d) 908, is applicable to this situation, when we held:

"Evidently what was the matter with the claimant was that his skin was irritated by long contact with the vapors and oil arising naturally in the course of the work he was engaged in, and was what was classed by the doctor as an occupational disease, for which compensation is not allowed under the statutes."

While we recognize the rule to be that the findings of fact by the Industrial Commission are conclusive upon this court, and will not be reviewed where there is any compe-

tent evidence to support the same, yet, when an examination of the record fails to disclose any competent evidence to support such findings of fact and the resulting award thereon, the question of liability becomes a pure question of law for the determination of this court.

We therefore conclude under the law and evidence that there is no competent evidence to establish an accidental personal injury. The cause is reversed and remanded, with directions to vacate the award.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, McNEILL, OSBORN, BUSBY, and WELCH, JJ., concur.