MARIETTA COREY, ET AL, CLAIMANT

vs.

WINCHESTER REPEATING ARMS, EMPLOYER
LIBERTY MUTUAL INSURANCE CO., INSURER

Superior Court    New Haven County    File #41417

Present:  Hon. ALFRED C. BALDWIN, Judge.

Armen K. Krikorian,      Attorney for the Plaintiffs.

Thomas R. Robinson,      Attorney for the Defendants.

MEMORANDUM FILED FEBRUARY 24, 1936.

BALDWIN, J.  The decedent was employed in the casting department of the Winchester Repeating Arms Company eighteen years as a caster's helper. In this department most of the casting is of brass, the formula for which is 68 percent copper and 32 percent zinc. About one-hundredth of one percent of each, the copper and the zinc, in the formula is lead. In order to cast brass these metals are placed in a crucible and melted in a pit fire and when it has reached a temperature of about 1500 degrees Fahrenheit the crucible with its molten mass is pulled from the fire and the contents of the crucible poured into cast iron moulds.

Lead begins to volatize at a temperature of 1425 degrees Fahrenheit and as the temperature of the molten metal is increased, volatization increases. Lead fumes emanate from the molten metal and more readily when pouring is being done. These fumes are heavier than air. They are invisible and remain about the vicinity of the metals from which they emanate, tapering off in the air as distance from such metal increases.

An average of twelve tons of brass was being cast in an eight hour day in the casting room where the decedent was employed. During war times this average went as high, or in excess, of one hundred tons a day. In the casting of twelve tons of brass 108,000 miligrams of lead is discharged into the air through volatization.

The casting room is approximately 250 feet long, 60 feet wide and 25 feet high. No artificial means of ventilation is provided. The windows are five feet above the floor and are kept open when casting. The doors open to the floor. Decedent's duties were to prepare the molds, to operate the cranes used in pulling the crucibles from the fires, to take down the molds, to remove the bars of brass from the molds and to trim off the fins from the edges of the bars of cast iron. These duties brought him in close proximity to the molten metals and within the area in which the lead fumes emanating from such metals were more likely to be found since these fumes are heavier than air, invisible and hang around the metals from which they emanate, tapering off as distance from such metals increases.

Lead may be taken into the system by ingestion and by inhalation. When inhaled in small quantities over a period of time it is deposited in the long bones and it may remain there and gradually accumulate over a long period of time without causing any particular disability, and then, something in one's diet or condition may cause a release of the accumulated lead and the real lead poisoning occurs.

No known case of lead poisoning has occurred among employees in this casting room prior to the instant claim, some of whom have been employed there longer than decedent. No examination or test has been made of any present or former employee to determine the presence or absence of lead in the system of any such employee.

Individuals vary in susceptibility to lead poisoning as they do in susceptibility to other diseases. Some medical authorities hold that as small a quantity as two milligrams of lead a day taken by inhalation into the system over a period of time will cause, in some, lead poisoning.

The decedent worked until August 27, 1934, and on August 30, 1934, was admitted to the Hospital of St. Raphael in New Haven, where he gave a history which included, "Present illness dates back two years when patient first noticed a gradual increase in nausea on inhaling fumes while at work." He died October 23, 1934, from chronic lead poisoning.

The foregoing are facts admitted or undisputed in the case.

The Commissioner in paragraphs 8 and 9 of his findings and award, finds as follows:

"8. The claimants claimed that the lead poisoning from which decedent suffered was a chronic condition due to and arising out of and in the course of the decedent's 18 years employment by the employer-respondent, and was an occupational disease within the meaning of the statute. This claim is found not proven."

"9. The lead poisoning from which the decedent suffered was not a disease peculiar to the occupation in which he was engaged or due to causes in excess of the ordinary hazards of employment as such."

Lead poisoning has been recognized as a compensable disease since **Chapter 142 of the Public Acts of 1919,** went into effect July first of that year. It continued as a compensable disease until **Section 7 of Chapter 307 of the Public Acts of 1927** became effective under the Healing Act by the General Assembly of August 6, 1929, which section is now section 5223 of the General Statutes. In this section the term "occupational disease" appears to first have been used and defined. Lead poisoning clearly may be an occupational disease, and by enactments of the General Assembly, made compensable.

I have studied the finding and award and the evidence certified and upon which the finding and award was based, with much care. It is admitted and the Commissioner has found that decedent died of lead poisoning. Whether it was chronic or acute is immaterial if it was due to and arose out of and in the course of his employment.

If the lead poisoning from which he died was due to, arose out of and in the course of his employment, it was a disease peculiar to the occupation in which he was engaged and due to causes in excess of the ordinary hazards of employment as such.

Our Supreme Court of Errors in **Glodenis vs. American Brass Co., 118 Conn. 29 at page 40, 170 Atl. 146,** discussing the statutory definition of occupational disease **(G. S. Sec. 5223)** said:

"This definition does not require that a disease to be within the definition, should be one which arises solely

out of the particular kind of employment in which the employee is engaged, nor that it should be due to causes in excess of the ordinary hazards of that particular kind of employment. Otherwise the definition would exclude most diseases; lead poisoning, for example, is not an ordinary incident of employment in general but arises particularly out of those processes in which lead is used and occurs in a number of kinds of employment, but for that reason it is not to be held to be outside the definition. The phrase 'peculiar to the occupation' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations; . . . . and the phrase 'employment as such' means employment in general. To come within the definition an occupational disease must be a disease which is a natural incident of a particular occupation, and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general." Citing **Industrial Commission vs. Roth, 98 Ohio St. 34, 38, 120 N. E. 172; Victory Sparkler & Specialty Co. vs. Francks, 147 Ind. 368, 379, 128 Atl. 635; Peru Plow & Wheel Co. vs. Industrial Commission, 311 Ill. 216, 221, 142 N. E. 546.**

The conclusion which the Commissioner arrived at expressed in paragraphs 8 and 9 of the finding and award must be that the lead poisoning from which decedent died was not an occupational disease in that it was not due to and did not arise out of or in the course of his employment, since, as we have seen, lead poisoning may be an occupational disease and is an occupational disease if it results from a hazard incident to the employment which hazard distinguishes the employment in character from the general run of occupations. **Glodenis vs. American Brass Company, supra.**

For the Commissioner to have arrived at these conclusions two factors must have been relied upon, since only these appear in the evidence to be a basis for such conclusions. The first of these factors is that, insofar as known, no other case of lead poisoning has developed among employees in

the casting department, of which, normally, there are twenty-five to thirty, some of whom had been longer employed there than had the decedent. This is a circumstance material and to be considered by the Commissioner. It should be remembered also that it is not a conclusive circumstance that individuals vary in susceptibility and that no tests have been made of any present or former employee to determine whether such employee is free from or affected with lead poisoning.

The other factor is the testimony of Dr. Vestal, the respondent-employer's industrial surgeon and doctor. Called by the respondent he testified as follows:

"Q—Did you examine this man? A—Yes, I did, while he was a patient at St. Raphael's Hospital.

Q—If you found anything pertaining to him after he died let us hear about it all? A—I think all that testimony has largely been presented. You have heard the picture of the man's physical disability and he died of lead poisoning, and so forth, and was autopsied. As far as that is concerned I have nothing particular to add."

Doctors Blumer, Zimmerman and Nesbit had testified to the probability that the decedent by inhalation of the fumes in the casting room where decedent was employed he contracted the lead poisoning from which he died. That these fumes were present in the quantity hereinbefore given was admitted by Dr. Vestal. Further he testifies:

"Q—Knowing the conditions under which Charley Corey worked there and the testimony that you have heard, and the fact that that condition—one 100ths percent lead was there, was there any industrial lead hazard? A—No, this whole question is very much overdrawn. If you stay around and talk lead poisoning the next thing it begins to get in your hair, your ears and eyes and every suspicious complaint you hear is lead. You go into this brass casting shop. They are turning out 12 tons a day or more up there. And these smoke fumes you hear so much about are nothing but charcoal fumes that go on top of the pots. The charcoal that goes on top of the pots to oxidize this substance and to keep it in there. All the lead that goes through that entire plant in one day is no bigger than your finger—one 100ths of one

percent. You can go right across the hallway there into the bullet casting shop and there are men working there 30 and 40 years over pure lead and now do you know how many cases we have had out of that?

Q—How many? A—Three, and we have never had one from this place. When you begin talking about lead poisoning from the rolling mill it is a different story. It is utterly absurd to think a man could get lead poisoning in that rolling mill."

Quoting from the long answer by the doctor—"If you stay around and talk lead poisoning the next thing it begins to get in your hair, your ears and eyes and every suspicious complaint you hear is lead." It no where appeared that the decedent had stayed around and talked lead poisoning or that he had it in his hair or ears or eyes. It did appear that he had been employed there eighteen years and that he in fact died of lead poisoning and that the kidneys showed degenerative conditions, all of the blood vessels showed a very severe degree of damage, the liver showed a lesser degree of damage of blood vessels; the periferal nerves were very badly injured and of the type which made it obvious that the lesions had been present for some months if not longer. The spinal cord showed marked changes as well as the brain, vascular changes of the heart and all of the organs appeared. All of the changes being quite characteristic of the pathological condition in lead poisoning. All of this Dr. Vestal heard and subscribed to. He agreed that when casting twelve tons of brass a day 108,000 miligrams of lead would be volatized in a day, after which the following questions and answers appear:

"Q—And do you believe that in a situation like that that a man cannot inhale lead fumes and get lead poisoning? A—Not sufficient to cause lead poisoning.

Q—How much is sufficient to inhale—for a man to inhale—to cause lead poisoning in a day? A—Keogh has worked it out pretty much in his researches in the University of Cincinnati and he thinks it is six milligrams—that is sufficient in a day's work, that is actual ingestion of the lead but you have got to consider here is a man who has been working in the casting shop for a great many years, everybody else has, and never has had lead poisoning. We never considered it a hazard

and never had any reason to think it was a hazard.

Q—How much lead does a man have to take in per day to contract lead poisoning? A—That is variable with the individual.

Q—Could as low as two milligrams per day over a period of thirty days or more cause lead poisoning? A—If shot into the blood stream.

Q—I am talking about inhaling through the respiratory tract? A—No.

Q—You differ in your opinion with Doctors Blumer, Zimmerman and Nesbit? Doctor, in your opinion if there is 108,000 milligrams of lead volatized and released into the atmosphere of that room could a man possibly take in two miligrams per day working there? A—Of course not. Did you ever see the place?

Q—No, I never saw the place. A—Come up and look at it.

Q—Please don't cross-examine me. I am just asking in your opinion is it possible? A—No.

Q—You examined Charles Corey? A—Yes, I did.

Q—There is no question in your mind that the man died of chronic lead poisoning? A—No, that seemed to me to be the logical conclusion.

Q—Could your examination show whether or not this smoke or fumes was contracted through the lungs or through the respiratory tract? A—There is no way to tell that."

Further on, the examination of the doctor relating to lead fumes, as follows appears:

"Q—Doctor, if a man is exposed to lead fumes for a long period of years, is it a reasonable possibility he might get lead poisoning? A—If the fumes are sufficiently concentrated and he is close enough exposed to them, yes.

Q—These lead fumes are invisible, aren't they? A—Yes, you cannot see lead in the air.

Q—So that the mere fact the smoke you talk about came from the charcoal doesn't mean there wasn't any lead fumes there? A—Not necessarily.

Q—Even if you cannot see any smoke there are still lead fumes present if there is lead being volatized from the pots? A—Yes, I think probably there is."

And further on in the examination as to inspection, the doctor testified as follows:

"Q—Just what inspection did you make, Doctor? A—Go in and see what the working conditions are, you find out what they are using and what they are doing, and how they do each job, whether or not any are sick and so on.

Q—Do you also test the atmosphere to get the lead content? A—No, that is the engineering part.

Q—Has it been done? A—It has been done in the building.

Q—In the brass casting shop? A—No, there has never been any lead in the casting shop, it has never occurred to us to make any there.

Q—So your company has never made a test of the air in the casting shop? A—No, and they probably never will because there isn't any lead there to amount to anything. It would be a waste of time. . . .

Q—Now, Doctor, as a matter of fact, not knowing the amount of lead fumes in the air which you have testified to, you don't honestly know whether or not there is a lead hazard there? A—Oh, figure it out yourself."

Here ends the doctor's examination.

I have quoted at length from this doctor's testimony because it appears to be, with the evidence that no other known case of lead poisoning has developed in this casting shop, the only answer respondents made to claimant's case. Analysis of Doctor Vestal's testimony discloses that substantially, if not entirely, he bases his conclusions upon the same premise— that no known case has developed within the casting shop, and yet, no test has been made of any present employee, and nothing is known of any former employee, and no hint or

suggestion of a hint is made as to where this decedent acquired the lead that could have so seriously affected him and caused his death other than due to and arising out of and in course of his employment which, upon the evidence appears to me to be the only reasonable and logical conclusion to be drawn, and that therefore it was an occupational disease.

While there is some controversy in the evidence, not as to the presence of lead fumes in the air, nor as to the effect of lead fumes upon a person when inhaled by him, nor that the effect, when inhaled, varies according to the susceptibility of the individual, nor that the organs of this decedent was badly affected from lead and that he died from lead poisoning, but only does the controversy exist as to whether, under the conditions, he could have inhaled sufficient of the fumes to cause the poisoning from which undeniably, he died.

The conclusions arrived at by the Commissioner seem to me to be so unreasonable and illogical upon the facts in the case as to require re-committal of the case to the Commissioner for the purpose of correcting the finding and award to conform with this memorandum.

The Commissioner, having found this was not an occupational disease, made no finding as to dependability or the rights of the claimants. In view of my conclusions and of the possibility of appeal these questions should be determined by him in order to present a record complete for the court upon appeal and not an academic question only.

Judgment may be entered in accordance herewith.