SMITH *v*. FENTRESS COAL & COKE CO.

(*Nashville,* December Term, 1948.)

Opinion filed July 9, 1949.

J. B. REAGAN, Jamestown, and HOLLIS A. NEAL, Jamestown, for plaintiff in error.

WARD R. CASE, JR., Jamestown, and ROBT. F. TURNER, Jamestown, for defendant in error.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This is a compensation case in which Fannie Smith, widow of Thurman Smith deceased, sued the Fentress Coal and Coke Company to recover compensation for the death of her husband. The only question before us is whether or not his death arose out of and in the course of his employment.

Thurman Smith had been employed by the defendant for a number of years before his death in one of its coal mines at Wilder, Tennessee. His principal duty was to remove trolley wires and steel rails from that part of the mine which had been worked out and abandoned. He may have assisted in removing pillars of coal as they operated from the back of the mine toward the front entrance. But this is not material. The deceased died of arsenic poisoning in November, 1946, following an illness of several months duration. Prior to March 14, 1946, at which time he was taken violently ill he appeared to be in excellent health. His wife, however, testified that for about three weeks before that date "he would come in from work with a headache, complained of his back and legs and right foot hurting. He would complain in his back and his stomach and his kidneys, he would say if he didn't feel better tomorrow he wouldn't work." On March 14, 1946, about 1:00 p.m.,

he became so violently ill in the mine that he had to be carried out by fellow employees. Following his removal from the mine, and for more than an hour thereafter, he continued to vomit and suffer pain. He was later carried to his home by fellow employees. Within a few days after this illness he was taken to a Nashville hospital where he remained for a day or two and then returned to his home. He made no improvement under the treatment of a local physician, but became progressively worse so that it became necessary that he return to the Burch Clinic in Nashville where he was treated for about ten days for what the doctors diagnosed as "arsenic poisoning." When he finally returned to his home his local physician treated him for this condition until his death.

The theory of the petitioner is that there is material evidence to show that his condition was the result of an accident while working in the defendant's mine; that his handling of corroded copper wire resulted in accidentally taking into his system such a quantity of arsenic as to cause his sickness and death; also that other conditions in the mine were contributing factors.

The trial judge found the following facts:

"Some of the copper wire and bronze brackets from the mine were analyzed and found to contain 0.033% arsenic, an amount very meager and no more than is commonly found in metals of this kind in daily use almost universally. This percentage of arsenic found in the metal was the only arsenic traceable to anything connected with the mine or its operation.

\* \*

"When deceased's illness first became apparent to himself and others there is no evidence that any extraordinary or unusual happening or event occurred to fix

the inception of the condition as to time and place or to relate its inception to an accidental injury.

"(*Gabbard* v. *P[roctor]* & *G[amble]* *Defense Corp.*, 184 Tenn. 464 [201 S. W. (2d) 651])

\* \*

"Frankly, it is believed that deceased died as a result of arsenic poisoning, but from what source did he receive into his body sufficient quantity to cause his illness and death as described in the evidence? It is believed not from metal in defendant's mine, one can speculate and guess, but such is not permitted.

"(*Home Ice Co.* v. *Franzini*, 161 Tenn. 395 [32 S. W. (2d) 1032])

"(*McBrayer* v. *Dixie Merc[erizing]* *Co.*, 178 Tenn. 135 [156 S. W. (2d) 408])

"(*Battle Creek Coal & Coke Co.* v. *Martin*, 155 Tenn. 34 [290 S. W. 18])

"It is believed the petitioner has failed to establish by a preponderance of the evidence that deceased died as result of an 'accidental injury' as contemplated by the act and that such accidental injury arose out of and in the course of his employment. The petition will be dismissed at petitioner's cost."

The foregoing finding of fact and conclusion of the trial judge is assigned as error.

We think the finding of facts and the court's conclusion is fully sustained by the weight of the evidence and the authorities cited. Moreover the alleged injury is not covered by Chapter 139, Public Acts of 1947 wherein it is provided that: "Injury and personal injury shall mean any injury by accident arising out of and in the course of employment and shall include certain occupational diseases arising out of and in the course of employment which cause either disablement or death of

the employee resulting from the hereinafter named occupational diseases." Following this provision of the statute there are mentioned nine occupational diseases, but "arsenic poisoning" is not one of them. The Act could not apply for the further reason that the injury sustained by Thurman Smith occurred prior to the passage of the Act.

We have given more than customary consideration to this case because of its importance to employees who are engaged in what is generally believed to be a hazardous if not dangerous occupation.

 Counsel for petitioner argues with much force that the evidence is of sufficient probative value to make out a case of accidental injury within the meaning of our Compensation Act, and that the testimony of the defendant's lone witness, Dr. A. W. Homberger does not contradict the petitioner's testimony. The defendant rightfully concedes that a compensable injury may be shown by circumstantial evidence. But the circumstances relied on must be sufficient to make out a *prima facie* case and at least take it out of the realm of speculation. *Home Ice Co.* v. *Franzini*, 161 Tenn. 395, 32 S. W. (2d) 1032. In addition to the petitioner's evidence relating to the character of work performed in the mine by the deceased, his contact with copper wiring, etc., the petitioner had certain parts of the wires analyzed by an expert chemist, Dr. D. C. Picard, which showed a "trace of arsenic," or to be exact "0.033%."

The defendant's witness, Dr. A. W. Homberger, testified to a scientific fact as follows:

"Q. In your opinion, from your experience in the medical profession, would there be any danger of a person working with or around copper, brass or bronze

containing 0.033% arsenic, obtaining arsenic poisoning from his contact with the metal? A. Definitely, no.''

The witness was cross-examined at length as to the effects of arsenic when allied with other metals but remained firmly of the opinion that the deceased could not have been poisoned by contact with the copper trolley wires that he had been handling and removing from the mine. He was unimpeached and no question is made as to his qualifications as a scientific man. He had taught chemistry and a branch of medicine at the University of Louisville for over thirty years. Another witness, Dr. C. F. Bradley, of the Burch Clinic, testified that the large amount of arsenic found in the body of the deceased could not have entered the body as a result of the patient ''having contact with copper wires that were corroded.'' This witness also was shown to be eminently qualified as an expert in the science of medicine. There is no evidence to the contrary. The defense introduced another witness, Cordell Spurlin, who testified to an important fact. He had been a coal miner for twenty-six years and was working in the mine at Wilder with the deceased at the time the latter became violently sick. He was running a motor on the date mentioned (March 14, 1946). He testified that he broke his thermos bottle and had no coffee for his lunch. Both he and Thurman Smith drank coffee from the latter's thermos bottle. He was asked as to the effect this coffee which deceased had given him had upon him and he answered as follows: ''A. I was kinda sick at my stomach, I left where Thurman and me was setting. I was setting in the motor car, I had a cake and a bag of peanuts, Lacy and his workers had a car of coal and I got on the motor to make their run. I went less than

a quarter of a mile and stopped and got out and vomited, and I thought I was going to die. "Q. Was you pretty sick?" A. "Yes, sir."

The circumstances which petitioner's counsel refer to as proof of an accidental injury are the following: (1) presence of sulphuric acid in the water in which miners often have to wade, (2) employees experiencing "a peculiar taste in their mouths when they smoked cigarettes", and which Dr. Homberger said was due to sulphuric acid in the mine, (3) the water in the mine was so contaminated "that no fish or other form of animal life could live in it", (4) other employees objected to doing the type of work which the deceased was doing, (5) water in the mines would cause a burning sensation to the hands and feet when contacted, and (6) arsenic as shown by the report of the chemist.

If the deceased died as a result of the combination of all of the foregoing circumstances over a period of several months or weeks the only reasonable conclusion to be drawn therefrom is that his sickness and death was not "accidental" within the meaning of the law but resulted from an occupational disease. The case of *Hartford Accident Indemnity Co.* v. *Hay*, 159 Tenn. 202, 17 S. W. (2d) 904 is cited and relied on by petitioner's counsel. But it is not in point since in that case there was no uncertainty as to the cause of Hay's injury or the manner and form in which he received it. We are also referred to the case of *Matthiessen & Hegeler Zinc Co.* v. *Industrial Board*, 1918, 284 Ill. 378, 120 N. E. 249, 20 A. L. R. 11; and *Nightingale* v. *Biffen*, 18 B. W. C. C. 358, an English case, as sustaining the petitioner's contention that this was an accidental injury. It is impossible to distinguish these cases from our own case of

*Home Ice Co.* v. *Franzini, supra,* and cases cited therein. *McBrayer* v. *Dixie Mercerizing Co.,* 178 Tenn. 135, 156 S. W. (2d) 408 and *Gabbard* v. *Proctor & Gamble Defense Corp.,* 184 Tenn. 464, 467, 201 S. W. (2d) 651, 652. We cannot depart from our own decisions and rest an opinion based upon authorities from a foreign jurisdiction which are not supported by the weight of authority. In the *McBrayer case, supra,* the death of the employee was immediately due to cancer of the breast, but contention was made that it had its inception in a traumatic injury sustained in the course of her employment. It was a disputed fact as to whether or not a cancerous condition could result from trauma. The suit was dismissed because it was speculative as to whether or not she sustained an injury arising out of and in the course of her employment. In *Gabbard* v. *Proctor & Gamble Defense Corp., supra,* the petition for compensation alleged that petitioner was from the 30th day of June, 1942, until the 18th day of June, 1945, and for approximately eighteen months prior thereto engaged in melting pentolite and in connection with his duties it was necessary for him to stand over a melting pot which was kept at all times at a very high temperature. He claimed that his injury was due to breathing fumes from the melting pot, that on the 18th day of June 1945 he became ill and was sent to a First Aid Station, etc. In holding that the petitioner did not sustain an accidental injury according to the allegations of the petition it was said: "On the statements of the pleadings, viewed most favorably to the petitioner, we cannot avoid the conclusion that petitioner's disease was a gradual result of breathing the fumes of the melting pentolite, and that the case, therefore, falls under the rule made in *Meade-Fiber Corporation* v. *Starnes,*

147 Tenn. 362, 247 S. W. 989, and *Morrison* v. *Tennessee Consolidated Coal Co., supra* [162 Tenn. 523, 39 S. W. (2d) 272]."

In the instant case we not only have the unequivocal and unimpeached testimony of qualified experts that the deceased could not have received "arsenic poisoning" while working in the defendant's mine, there being only a bare trace of it appearing upon the copper wires, but the testimony of a fellow worker who became violently ill from drinking coffee from the deceased's thermos bottle and which was on the same day and about the same hour that the latter became ill, as we have heretofore pointed out.

When we consider the nature and scope of the evidence offered by both petitioner and the defendant we are forced to the conclusion that it is highly speculative as to the source from which the large amount of arsenic came which ultimately caused the death of Thurman Smith. The only way the trial court could reach the conclusion that his death was due to conditions in the mine and especially his contact with the small amount of arsenic described on the copper wires would be to infer something to be true merely because some other thing is inferred or supposed to be true. In other words he would have to infer (1) that his body became contaminated with the arsenic, (2) that it gradually accumulated in his body for several months or weeks without any apparent ill effects, and (3) that it suddenly affected him to the point where he was taken violently ill and was beyond all medical aid. He refused to do so upon the ground that it was speculative and the court's decision could not be rested upon a bare conjecture. We have steadfastly held to this rule and no exception can be

made in the instant case. The rule announced in *Home Ice Co.* v. *Franzini, supra,* and other cases cited, would be controlling in determining whether the death of this employee was accidental within the meaning of the law or resulted from an occupational disease arising out of and in the course of his employment and which is not covered in the amendment to the Workmen's Compensation Law.

The assignments of error are overruled and the judgment of the trial court is affirmed.

All concur.